THIRD DIVISION
MARCH 8, 2006

1-05-2673

| In re: | ) | Appeal from the |
|---|---|---|
| CHRISTOPHER S., Minor, | ) | Circuit Court of |
| Respondent-Appellant | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | No. 04 JA 01045 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| Carol S. and James S., | ) | Stephen Y. Brodhay, |
| Respondents-Appellees). | ) | Judge Presiding. |

JUSTICE ERICKSON delivered the opinion of the court:

Following an adjudicatory hearing, the circuit court found that minor, Chris S., was dependent through no fault of his parents, respondents Carol S. and James S. After a dispositional hearing, the circuit court found that respondents were unable to care for Chris. On appeal, the guardian ad litem, on behalf of Chris, contends that the circuit court erred by (1) finding that Chris was a dependent minor through no fault of his parents, and not a neglected minor, (2) finding that respondents were unable, but not unwilling, to care for Chris, and (3) failing to provide a sufficient factual basis for its finding.

BACKGROUND

Chris's History

Chris was born on December 17, 1987. In 1990, at age three, Chris came to the attention of DCFS when his biological mother left him in a car unattended while she went to a bar to drink.

On April 10, 1999, respondents became Chris's foster parents. Prior to his placement with

respondents, Chris was in seven different foster homes. On May 3, 2001, respondents' adoption of Chris was finalized.

According to the service plans in evidence, although Chris has no current psychiatric diagnosis, he has had a varied and constantly changing mental health history. He has received various psychiatric or psychological evaluations over the years. The psychiatric diagnoses that he received were the following: attention deficit hyperactivity disorder, bipolar disorder with psychotic features, bipolar disorder, generalized anxiety disorder, major depressive disorder, and conduct disorder. He was prescribed Dexedrine, lithium, and Remeron. The record does not disclose the exact dates or qualifications of the clinician making the diagnosis.

Commencing in June 1995, Chris has participated in years of family and individual therapy. After the adoption, Chris has participated in family and individual therapy from October 2001 through June 2004.

Petition for Adjudication of Wardship

On September 9, 2004, the State filed a petition for adjudication of wardship, alleging that Chris was neglected because respondents, his parents, were not providing the care necessary for his well-being. Specifically, the petition stated that on June 17, 2004, respondents refused to allow Chris to return to their home and refused to create a care plan for him. The petition also alleged, based on the same facts, that Chris was abused because he was subject to substantial risk of physical injury. After a temporary custody hearing, on September 30, 2004, the circuit court awarded temporary custody of Chris to the Department of Children and Family Services (DCFS) guardianship administrator. A Cook County public guardian was appointed as attorney and guardian ad litem for Chris, and private attorneys entered appearance on behalf of respondents. On November

18, 2004, the State filed a motion to amend the petition to strike the allegation of abuse and add the allegation of neglect due to Chris's home being an injurious environment based on the same facts previously alleged.

## Adjudicatory Hearing

At the adjudicatory hearing, on February 28, 2005, Bary Brown, a DCFS investigator, testified that she was assigned to investigate an allegation that Chris had been locked out when his parents refused to pick him up from Alexian Brothers Hospital (Alexian) in June 2004. Respondents told Brown that they were not willing to accept Chris back into their home because he was out of their control and had threatened violence against the family. Chris told Brown that because respondents did not want him home, he did not want to live with them. Brown testified that respondents tried to make alternative arrangements for Chris with Mercy Home (Mercy), which DCFS would have regarded as an acceptable solution. Respondents were willing to pay for Mercy. When Mercy denied Chris's admission, respondents eventually facilitated, at Chris's request, a short-term guardianship with his biological aunt. The investigation into the allegation of Chris's lockout was eventually unfounded.

At the close of Brown's testimony, the State and the guardian ad litem rested. Respondents moved for a directed finding based on Brown's testimony that they provided alternative care for Chris. The circuit court denied their motion. After respondents' opening statement, they requested a finding of no-fault dependency. The State also requested to amend its petition to add the allegation of no-fault dependency. Without objection, the State's motion was granted.

Respondents then presented the following evidence. In October 2001, respondents hired Dr.

Bolton, a clinical and school psychologist, to help with Chris's behavioral problems at school and at home. Dr. Bolton provided family and individual therapy to the S. family and Chris. He stated that Chris was increasingly getting out of control in his ability to follow rules and manage a respectful relationship with respondents. He also stated that he never witnessed Chris acting violently, but he was aware of issues that would cause unpredictable rage reactions in Chris. In addition, Dr. Bolton believed that respondents were committed to Chris. He stated that they were consistent in their attendance and they worked very hard while in therapy to make the adoption work.

In August or September 2002, respondents found $4,000 to $5,000 in the house, including Euros and Canadian money, and a bank slip for thousands of dollars from an unfamiliar bank. When they discussed their findings with Chris, he told them that his "biological father"[1] sent them to him from prison. Respondents called Officer Theresa Pressley, a Northbrook police officer, because they believed that Chris had stolen the money. Subsequently, Pressley spoke with a prison warden who told her that it was impossible for the inmate to have sent the money to Chris. The source of the money was never determined.

---

[1]There is some confusion regarding the true identify of Chris's biological father. His biological father is deceased, allegedly murdered by his uncle who is now incarcerated. Chris refers to his uncle as his biological father.

Over the next two years, Pressley received occasional telephone calls from respondent mother concerning Chris's inclinations to run away from home and damage the home by punching holes in the wall and door of the house. In response to the telephone calls, Pressley went to respondents' residence approximately five to eight times. Over time, she became familiar with respondents and she opined that they were concerned parents. She stated that when she talked to respondents, they were terrified of Chris and feared that something would happen in the household. Specifically, respondent mother was concerned about her safety because Chris's aggressive behavior escalated when she was alone with him.

During one incident in June 2002, Pressley received a telephone call that Chris was throwing things in the home. When she arrived, she observed a hole in the wall and a hole in the door. She stated that she had to remove Chris, who was approximately 6 feet 1 inch tall, from the house because he was "looming" over his mother while screaming in her face. Pressley believed that respondents legitimately feared for their safety. She also stated that she never observed Chris's behavior escalating in front of respondents' other two children, Jeff and Laura.

In the fall of 2002, Chris began to exhibit more defiant and aggressive behaviors at home and antisocial behaviors in the community. Respondents decided to send Chris to Howe Military School (Howe) because he was becoming more explosive and they believed Glenbrook North High School (GBN) was not providing him the help he needed. They did not tell Chris about their decision to send him to Howe until they arrived there.

Respondents paid approximately $23,000 to $25,000 for the year Chris was at Howe. The adoption subsidy they were receiving, $1,072 per month, covered only part of the cost. They also

paid for the counseling sessions with Dr. Bolton and allowed Chris to participate in many activities such as soccer, baseball, wrestling, the Boy Scouts, church activities, and music lessons.

Chris attended Howe for his freshman year of high school. He felt rejected because he was sent away to a military school. However, he was successful there and excelled academically. During a counseling session the summer after his freshman year, respondents and Chris discussed where he would spend the following school year. Chris requested to come back home because he wanted to attend GBN. He argued that he had done everything respondents had asked of him at Howe. Although it was a difficult decision, respondents allowed him to return to their home because they missed him and they wanted to instill a positive reinforcement. Chris returned home and attended GBN in the fall of 2003.

At first he adjusted well at GBN. However, in the late winter of 2003 and early spring of 2004, respondents again found items they suspected were stolen, such as gift cards, a digital camera, debit and credit cards, and foreign currency. When Chris was asked about these items, he gave "explosive" answers. The relationship with the family continued to deteriorate. Chris also made threats to respondent mother. Although Chris never hit her, she believed that he would one day step over the line and hit her. In April 2004, he left a note on the computer that he wanted to take a bat to respondents.

In May or June of 2004, Chris had a significant falling out with his adopted brother, Jeff. Jeff felt that Chris had "betrayed" him because Chris had told some mutual friends that respondents were treating him poorly.

On June 4, 2004, after respondents found more unusual items in the house, an altercation

ensued between Chris and respondents. It ended with Chris storming out of the house. Later, Chris telephoned the house and had an altercation with Jeff over the phone. They were screaming at each other and Jeff suffered a paralysis attack due to Jeff's neurological condition that causes him to suffer paralysis under stress. Chris later returned home and told respondents that Jeff would not need a funeral because there would be no body parts to bury. He also filed a complaint with the police against Jeff.

The next morning, after respondent father and Jeff left the house, Chris had another altercation with respondent mother. He accused her of lying in a letter written several years ago when she was a foster parent where she kept a record of his behavior, such as having diarrhea, after seeing his biological mother. He began screaming and swearing at her about how she had denied him his right to see his biological mother. As respondent mother backed away from him, he threw a telephone over her head. The phone missed her and broke a light fixture above her head and pieces of glass fell all over the floor. He continued to follow her until she was cornered against the kitchen wall and punched a hole in the wall next to her. She called 911. Chris left on his bicycle with some of his belongings.

Respondents consulted with Dr. Bolton, Alec Ross, the executive director of Haven Youth and Family Services (Haven), and the Northbrook police. Dr. Bolton felt that the right course of action was for Chris to undergo a psychiatric assessment and hospitalization. Respondents decided to admit Chris to Alexian for an evaluation of his threatening behavior, his rage, and possible thefts. When Chris was found at a friend's house after midnight the next day, the police asked if he would be willing to go to a hospital for a psychiatric evaluation. He agreed. He was admitted on June 6,

2004. One reason for his admission was due to his positive test result for marijuana.

On June 9, 2004, respondents visited Chris at Alexian. After they began talking, he became agitated and started walking toward them. Hospital staff restrained him and took him out of the room. They then asked respondents to leave. Respondents tried to call Chris almost daily, but he usually hung up the phone. Thereafter, respondent father visited Chris in the hospital two more times during his 11-day stay and respondent mother visited once.

During the hospitalization, respondents had meetings with the staff at Alexian, including the psychiatrist Dr. Feld, the staff at Haven, and Dr. Bolton about Chris's discharge plans. Respondents did not want him to return home because they feared for their family's safety. Dr. Bolton did not believe it was a good idea for Chris to return home "given the emotional climate and the lack of trust in the family." Dr. Feld told respondents he felt that a residential placement was in order because of Chris's rage. He suggested taking medication to calm Chris's rages, but Chris refused to take them. Staff at Haven recommended that respondents should refuse to pick Chris up upon his discharge from the hospital so that it could be brought in as an intervention agency to help.

On June 17, 2004, Chris was discharged from Alexian. Respondents told DCFS they would not allow Chris back into their home until they were satisfied it could be done safely. Respondent mother also felt that he needed more help than she could provide for him at home. Chris was placed at Shelter, Inc. (Shelter), a temporary shelter, while respondents pursued a more permanent placement. Respondents paid for a portion of Shelter's cost. While Chris was at Shelter, respondents were advised not to visit him because he was depressed and agitated.

In June 2004, Brown, a caseworker from DCFS, was assigned to investigate the allegation

that Chris had been locked out by his parents. On July 1, 2004, respondents attended a meeting at the DCFS office. Brown, Janet Ahern, an assistant deputy counsel for DCFS, Paul Janis, a Catholic Charities staff member, and Ross, the executive director of Haven, were also present. The purpose of the meeting was to assess the situation and plan for Chris's future placement. They discussed long-term placement solutions, including Mercy, which was acceptable to DCFS. DCFS told respondents that if Mercy accepted Chris, there would be no "indicated" finding against them. Respondents went to an interview session at Mercy, which Chris also attended, but Chris refused to be in the same room as respondents. While waiting for Mercy's reply, the S. family went on a preplanned vacation to Ireland in mid July of 2004. They had bought a ticket for Chris; however, he was unable to go because he was at Shelter. During this time period, respondents gave temporary guardianship to respondent father's brother so that someone would have authority to sign for Chris's admission to Mercy if it accepted him. This arrangement was acceptable to DCFS. However, Chris was not accepted at Mercy due to his defiance, lack of openness to therapeutic growth, and theft problems.

The staff at Mercy suggested that respondents contact The Mill (Mill), another residential placement home. Respondent father contacted Mill at the end of July 2004. However, respondents could not afford to send him there because the service fee was approximately $2,000 per week.

After Chris was rejected by Mercy, he begged to stay with his biological aunt. Although respondents had some reservations about placing him with her, they gave temporary guardianship to her because they did not have any alternatives. At that time, Chris refused to live with respondents. During Chris's stay with his biological aunt, the biological aunt testified that she called the police on

him twice. She also testified that she was afraid of Chris because he was psychologically manipulative and intimidating. On August 26, 2004, she locked him out of her house. Chris went back to Shelter. Respondents tried calling him there within 24 hours of his placement, but he refused to take their call.

Between June 2004 and September 2004, respondent father contacted over 43 different agencies and individuals for help. He also called his state representative for help. In late June 2004, respondents called the DCFS postadoption services on numerous occasions. They received a return call on July 10, 2004, and were told that someone would look into the situation and get back to them. They also met with a staff person at Catholic Charities to discuss placement options for Chris. Respondents were willing to pay as much as they could afford for Chris's care. However, respondents could not find an affordable facility that would accept him. Chris's age, his pending criminal issues, and his status as not a ward of the State complicated the situation because certain placement options were foreclosed. Howe would not accept him because of his pending criminal charges. In August 2004, respondents arranged a meeting with Dr. Krause, a psychiatrist, to evaluate Chris and to facilitate a placement plan. This evaluation was scheduled for September 2004, but Chris did not attend the appointment.

In September 2004, respondents attended another meeting at DCFS. Ahern and Ross were also present at the meeting. Respondent mother thought the purpose of the meeting was to discuss Chris's placement after he was locked out from his aunt's house. Instead, she was told that DCFS was entering a finding against her. At that time, respondents were still searching for a care plan for Chris. Ross recommended placing Chris at Shelter because he was doing well there. Ahern did not

know whether respondents could privately place Chris at Shelter permanently without him being a ward of the State. Chris was later moved to an emergency intake center. At the time of adjudication, respondents were willing to take Chris home if it was safe to do so.

After respondents rested, the guardian ad litem called Ahern as Chris's first witness. She stated that she first became involved in the case on July 1, 2004. At the September 2004 meeting, she testified that respondent mother indicated to her that she would not take Chris home. She also believed that Chris was not willing to return to respondents' home. In addition, she stated that if Chris had been accepted at Mercy, DCFS would not have indicated a finding against respondents.

Ross testified that respondents were involved in the crisis intervention in June 2004. Initially, Chris expressed a desire to go back home, but as time passed, he changed his mind and indicated that he did not want to go home. Ross opined that Chris was "confused, somewhat depressed, angry in terms of what was happening in his home." Ross stated that respondents indicated to him in the September 2004 meeting that they would take Chris home if someone could guarantee their safety. He believed that respondents were afraid for their safety. Ross also stated that he never had a concern for his own safety with Chris. On September 8, 2004, Ross sent a letter to Brown, a DCFS caseworker, recommending a residential placement or Shelter's transitional living program for Chris.

On June 30, 2005, the State, in its closing argument, asked for a finding of no-fault dependency. Respondents also asked for a finding of no-fault dependency. The guardian ad litem asked for a finding of neglect due to the lack of necessary care. The circuit court entered an adjudication order finding Chris was dependent through no fault of his parents.

Disposition Hearing

At the disposition hearing, on July 20, 2005, Abraham Nedungatt, a DCFS child placement worker, testified that Chris, who was 17 ½ years old, was currently placed at ChildServ, a group home. He stated that the only service he recommended for respondents was family therapy. He stated that although respondents were willing to participate, Chris was not. Only one family therapy session took place in February 2005, due to Chris's refusal. No further family sessions were scheduled because the therapist determined it was not in Chris's best interest to pressure him at that time.

Nedungatt stated that Chris was doing well at ChildServ. He was attending school and regularly participating in individual and group therapy. Although Nedungatt recommended substance abuse treatment, Chris refused to participate after attending a few sessions. Since living at ChildServ, he has been arrested twice, once for underage drinking and once for possession of marijuana. Additionally, he had been arrested for damage to property at the previous group home. He was on probation at the time of the disposition hearing. Chris told Nedungatt that he did not want anything to do with respondents. Nedungatt spoke with respondents because they were willing to work to have Chris return home. At Chris's request, Nedungatt admitted that he did not give any information to respondents regarding Chris's progress or health in the last three months. He recommended that Chris be made a ward of the State.

The guardian ad litem called respondent mother to testify. She stated that her last visit with Chris was in February 2005 during a family therapy session. She also stated that she and her husband called ChildServ every week to ask if Chris would speak to them. In addition, she testified

that she wanted Chris to return home, but still did not feel that it was safe for them or for Chris at that time. The guardian ad litem called respondent father to the stand and he gave substantially the same testimony as respondent mother.

During closing arguments, the State requested respondents be found unable to care for Chris through no fault of their own. The guardian ad litem asked that the circuit court find respondents were both unable and unwilling to care for him. Finally, respondents asked for a finding that they were unable to care for him.

The circuit court adjudicated Chris a ward of the court and found respondents were unable to care for, protect, train or discipline him. In making its finding, the circuit court reasoned that Chris's conduct contributed to respondents' inability to parent him. It stated that Chris was 17 ½ years old and should have taken some responsibility for the relationship with his parents, and that his parents tried their best to mend the relationship, short of trying to force him.

## ANALYSIS

The guardian ad litem first contends that the circuit court's finding of no-fault dependency is against the manifest weight of the evidence. He argues that the circuit court should have instead made a finding of neglect due to lack of necessary care. See 705 ILCS 405/2-3(a) (West 2004).

We first note that while the issue of mootness was not raised by any party, it has come to our attention that Chris has reached the age of 18 during the pendency of this appeal. A case becomes moot if the issues involved in the circuit court no longer exist because events occurring after the filing of the appeal render it impossible for the reviewing court to grant the complaining party effectual relief. In re A. F., 234 Ill. App. 3d 1010, 1013, 602 N.E.2d 480 (1991). Here, as Chris has

reached the age of 18, he can no longer be adjudged a dependent minor or a neglected minor pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-4(1), 2-3(1)(a) (West 2004) (the Act defines a dependent minor and a neglected minor as "any minor under 18 years of age")). We need not reach the question of mootness, however, for we are compelled by the evidence not to disturb the circuit court's finding of a no-fault dependency. See In re Jerome F., 325 Ill. App. 3d 812, 819, 757 N.E.2d 905 (2001).

Section 2-4(1)(c) of the Act provides a dependent minor includes any minor under 18 years of age "who is without *** other care necessary for his or her well being through no fault, neglect, or lack of concern by his parents." 705 ILCS 405/2-4(1)(c) (West 2004). The State has the burden to prove the allegations only by a preponderance of evidence. In re Christina M., 333 Ill. App. 3d 1030, 1034, 777 N.E.2d 655 (2002) (Christina M.). On review, a reviewing court may not reverse a circuit court's determination unless the findings are against the manifest weight of the evidence. In re T.B., 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893 (1991). A circuit court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record. In re Edward T., 343 Ill. App. 3d 778, 794, 799 N.E.2d 304 (2003).

In In re S.W., 342 Ill. App. 3d 445, 447-48, 794 N.E.2d 1037 (2003), the 12-year-old minor was out of control, defiant, and was hitting her mother. She was previously hospitalized twice for her aggressive behavior. On August 1, 2001, a report was made when the mother refused to take S.W. home from a hospital. The mother tried to hospitalize S.W., but the hospital denied her admission. At that time, the mother indicated that she would not take S.W. home with her. This was the only reason S.W. was taken under protective custody. The court found that the trial court's

finding of no-fault dependency was not against the manifest weight of the evidence. In re S.W., 342 Ill. App. 3d at 451-52.

Similarly, in this case, the circuit court correctly found that Chris was dependent through no fault of respondents. The evidence at the adjudicatory hearing established that Chris had a very troubled relationship with his respondent parents. He began having altercations with respondents after they found suspected stolen items in the house. In April 2004, he left a note on the family computer that he wanted to take a bat to respondents. It is undisputed that he used verbal and physical intimidation toward respondent mother on more than one occasion. The record indicates that respondents made numerous attempts to mend their relationship with Chris. It was not until a violent altercation occurred where Chris, while yelling at his mother, threw a telephone over her head and punched a hole in the wall right next to her, that respondents felt that he needed professional help. Chris was admitted at Alexian for a psychiatric evaluation the next day. When respondents visited at the hospital, he had to be restrained by the staff because he became agitated and started walking toward them. Thereafter, respondents did not want him to return home because they feared for their family's safety.

The evidence is clear that respondents tried to provide alternative care for Chris. Dr. Bolton and Dr. Feld recommended that it was in Chris's best interest to be placed in a residential placement rather than returning home. After Mercy denied Chris's admission due to his defiance, lack of openness to therapy, and theft problems, he was placed with his biological aunt at his request. However, this placement did not last long. Chris's biological aunt testified that Chris intimidated her because he would become verbally abusive and psychologically manipulative when he did not get

his way. She called the police twice on Chris during his stay at her house. After the second incident, she asked the police to remove him from her home, fearing for her safety. The evidence also shows that between June 2004 and September 2004, respondents contacted over 43 different agencies and individuals in an attempt to find alternative care for Chris. However, defendants were unable to find an affordable agency willing to take him. Additionally, his age and his pending criminal issues foreclosed several possibilities. During this time, Chris indicated that he did not wish to return to respondents' home or want any contact with them.

In finding that Chris was dependent through no fault of respondents, the circuit court relied on Ahern's testimony that if he had been accepted at Mercy, which respondents were willing to pay for, DCFS would not have filed a neglect petition against respondents. Moreover, the court noted that the guardian ad litem's own witness, Ross, testified that he recommended that Chris remain in a residential placement and not return home. Contrary to the guardian ad litem's contention, the circuit court did not place equal responsibility on Chris as respondents to mend the relationship with his parents. Rather, the circuit court found that the facts of the case fit the purpose of the no-fault dependency provision because the underlying issue was neither Chris's nor respondents' fault. Thus, the circuit court found that Chris was dependent through no fault, neglect, or lack of concern by respondents. We find that this finding is not against the manifest weight of the evidence.

The guardian ad litem's argument that the circuit court should have found Chris a neglected minor is without merit. The Act defines a "neglected minor" as a child under 18 years of age "who is not receiving proper or necessary support *** or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parents." 705 ILCS

16

405/2-3(1)(a) (West 2004).

Generally, "neglect" is defined as the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties. Christina M., 333 Ill. App. 3d at 1034. The term is not a "fixed and measured meaning" and it takes its content from specific circumstances of each case. Christina M., 333 Ill. App. 3d at 1034. Accordingly, cases involving an adjudication of neglect and wardship are sui generis, and each case must be decided on the basis of its own unique circumstances. Christina M., 333 Ill. App. 3d at 1034.

The guardian ad litem, relies on our supreme court's decision in In re Arthur H., 212 Ill. 2d 441, 466-67 (2004) (Arthur H.), to assert that when considering whether a finding of neglect is appropriate, the circuit court must consider only whether the minor is in fact neglected, and shall not consider the parents' actions. While Arthur H. does make such a finding, that case is distinguishable from the case at bar. In Arthur H., the State filed a three-count petition alleging the minor, and his siblings, were neglected. In this case, the State's petition contained three counts and alleged, after numerous amendments, that Chris was neglected as well as dependent through no fault of his parents. Thus, in this case, the parents' actions were required to be considered by the court, as section 2-4(c) of the Act provides a child under the age of 18 is dependant if the minor is "without *** other care necessary for his or her well being through no fault, neglect or lack of concern by his parents." (Emphasis added.) 705 ILCS 405/2-4(1)(a) (West 2004). Thus, we reject the guardian ad litem's broad interpretation of Arthur H. and find that case inapplicable here.

In this case, we find that the evidence does not support a finding of neglect due to lack of necessary care. Rather, the evidence is clear that respondents did not neglect Chris. The guardian

ad litem would have this court find that respondents neglected Chris because they could not accomplish an impossible task, which was to force Chris to partake in the process of returning home against his will. The guardian ad litem's argument defies logic, common sense, and most importantly the law. The cases upon which the guardian ad litem relies are distinguishable as respondents in this case only refused to take Chris home after a violent incident ensued, causing respondent mother to fear for her safety and that of her family. Caring for respondents' family's safety, which also included Chris's own safety, showed great parental concern for Chris's well being, not neglect. Furthermore, respondents made every effort to arrange an alternative care they could afford. As explained above, the circuit court correctly found that Chris was a dependent minor through no fault of respondents. We therefore find that the circuit court's decision is not against the manifest weight of the evidence.

Next, the guardian ad litem contends that the circuit court's finding that respondents were unable, but not unwilling, to care for Chris is against the manifest weight of the evidence.

At a dispositional hearing, the standard of proof for a circuit court's finding is a preponderance of the evidence. In re April C., 326 Ill. App. 3d 245, 257, 760 N.E.2d 101 (2001) (April C.). On review, the standard of review is the manifest weight of the evidence. April C., 326 Ill. App. 3d at 257.

At the disposition hearing, the evidence indicates that respondents were willing to participate in family therapy, which was the only service recommended by DCFS case worker Nedungatt. Nedungatt testified that only one session took place because Chris was unwilling to participate and the therapist recommended that Chris not be pressured into any further session, as it would not be in

18

his best interest. Nedungatt also testified that Chris did not want any contact with the respondents. He admitted that he stopped giving Chris's information, at his request, to respondents. Respondents testified that they wanted Chris home as long as it was safe for the family. Based on the evidence, the circuit court's finding that parents were unable, but not unwilling, to care for Chris is not against the manifest weight of the evidence.

Finally, the guardian ad litem argues, in the alternative, that the circuit court did not provide a sufficient factual basis for review of its disposition order. See 705 ILCS 405/2-27(1) (West 2004).

We initially note that the issue has been waived for purposes of appeal as the guardian ad litem failed to object at trial and include it in the posttrial motion. In re Dominique W., 347 Ill. App. 3d 557, 565, 808 N.E.2d 21 (2004). Wavier aside, we find that the circuit court's dispositional order is sufficiently supported by facts to advise the parties the reasons for making the minor a ward of the state.

Our supreme court has held that explicit oral findings on the record may satisfy the statutory requirement if they inform the parties of the basis for the court's decision. In re Madison H., 215 Ill. 2d 364, 376-77, 830 N.E.2d 498 (2005).

Here, the circuit court gave the following oral explanation for its dispositional ruling:

> "The [c]ourt further finds at this time that both the mother and
> the father are unable to care for, protect, and train the minor. Now I'll
> emphasize unable only, to care for, protect and train the minor, based
> as much on the minor's conduct as the [sic] anything that the parents
> have done.

19

The [c]ourt heard the trial in this case and entered a finding of no fault dependency. The [c]ourt has heard evidence today that it's the minor who is 17 and a half years of age and he should at this point take some responsibility for the relationship with his adoptive parents. And, apparently, is not doing so at this time. And that the parents are doing everything they can short of forcing and perhaps exacerbating the problem of the minor. And therefore, it will be a finding of inability only."

The circuit court's oral statement explains that Chris's conduct attributed to respondents' inability to care for him, noting that respondents were doing every thing they could, short of forcing him. In the disposition hearing, the evidence establishes that the only service recommended for respondents was family therapy. The record also indicates that respondents were willing to participate in the therapy; however, their attempt was unsuccessful as Chris was unwilling to participate. Thereafter, no further sessions were scheduled because the therapist recommended that it was in Chris's best interest to not pressure him to attend against his wishes. Contrary to the guardian ad litem's assertion that the circuit court placed equal responsibility on Chris as on respondents, the order merely acknowledges the reality of the situation that respondents cannot repair the relationship without Chris's willingness to do so. We find that the circuit court's order is sufficiently based on factual findings and advised the parties of the basis for its ruling.

## CONCLUSION

For all the foregoing reasons, we affirm the decision of the circuit court.

1-05-2673

Affirmed.

HOFFMAN, P.J., and KARNEZIS, J., concur.