2023 IL App (1st) 230059

Second Division
September 12, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* D.B., a Minor, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 21 JA 01180 |
| v. | ) ) | |
| C.L., | ) ) | Honorable Demetrios Kottaras, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Presiding Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent-appellant, C.L., is the biological mother of the named minor, D.B. Following adjudication and dispositional hearings, the trial court found D.B. to be neglected pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)), determined that C.L. was unable for some reason other than financial circumstances to care for, protect, train, or discipline D.B., and awarded guardianship to the Department of Children and Family Services (DCFS). C.L. appeals, arguing that the trial court's adjudicatory findings of neglect were against the manifest

weight of the evidence and that the court should have instead made a finding of dependency through no fault of C.L. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      C.L. is the biological mother of D.B., born August 11, 2005. D.B. was 16 years old at the time this action was instituted.

¶ 4      On December 21, 2021, the assistant state's attorney filed a petition for adjudication of wardship for D.B., alleging that he was neglected due to an injurious environment (*id.* § 2-3(1)(b)) and due to a lack of necessary care (*id.* § 2-3(1)(a)) and that he was abused due to a substantial risk of physical injury by other than accidental means (*id.* § 2-3(2)(ii)). In support of the allegations, the petition set forth the following:

> "Mother has one prior indicated report for cuts, bruises, welts, abrasions and oral injuries. On or about March 1, 2021, an intact case was opened after mother and this minor were involved in a physical altercation with each other. Mother punched this minor in the face and hit him with a lamp during this incident. This minor was observed to have several bruises after this incident. Mother has been non-compliant with offered and recommended services. On or about December 20, 2021, mother and this minor were involved in another altercation with each other. Minor eloped after this altercation and his whereabouts are unknown. Mother states that this minor cannot return to her home. Putative father states this minor cannot reside with him. Paternity has not been established."

¶ 5      On that day, DCFS was appointed as D.B.'s temporary custodian, and a guardian *ad litem* (GAL) was appointed for D.B. An attorney was also appointed to represent C.L. in these proceedings.

¶ 6    On December 22, 2021, because D.B.'s whereabouts were then unknown, the court entered a child protection warrant. This warrant was later quashed and recalled.

¶ 7    On January 20, 2022, the court entered an order finding that D.B.'s putative father appeared in court on December 21, 2021, and had been advised of his rights in this proceeding. The putative father had the opportunity to speak with an attorney and subsequently declined to participate in any court proceeding. The court found that the putative father voluntarily and knowingly waived his right to participate in this action.[1]

¶ 8    On November 28, 2022, the adjudication hearing was held via video communication without objection. The State, C.L., D.B., the GAL, and C.L.'s counsel were all present. At the outset, the State withdrew the allegation of abuse. The following evidence was then presented.

¶ 9    James Wilson, the DCFS investigator assigned to D.B.'s case, testified that he was referred to investigate an allegation of abuse of D.B. in January 2021 and that he was assigned to investigate two separate hotline calls in December 2021.

¶ 10    In January 2021, there was a call reporting a physical altercation between C.L. and D.B. Both admitted to the altercation. As a result, C.L. and D.B. were referred for intact family services through Hephzibah, a private child welfare agency. C.L. was found "indicated" for "cuts, bruises, welts, abrasions, and oral injuries" due to mutual combat with D.B.[2] During that investigation, Wilson observed only minor injuries, such as scratches, on the parties.

¶ 11    The December 2021 incident, characterized as a "D" sequence, involved a report that C.L. was refusing to allow D.B. back into the home. Wilson spoke with D.B. on December 2, 2021, at

---

[1]The putative father is also not a party to this appeal.

[2]The Abused and Neglected Child Reporting Act defines an " 'indicated report' " as "a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2020).

the shelter where he was staying, and he learned that D.B. had previously been living with his grandmother after his mother kicked him out. Wilson subsequently spoke with C.L. via telephone. In that conversation, C.L. stated that D.B.'s behavior was "out of control." She additionally expressed concerns about inappropriate sexual behavior. The following day, Wilson met with C.L., at which time she reiterated the same concerns. On December 3, 2021, Wilson spoke with the putative father by telephone, and the father informed Wilson that he did not have room for D.B. in his home. That week, C.L. briefly allowed D.B. to come home.

¶ 12    On December 20, 2021, there was a hotline call involving a lockout, characterized as an "E" sequence because D.B. had been psychiatrically hospitalized and C.L. was refusing to pick him up from the hospital. When Wilson spoke with C.L. via telephone, she was "going back and forth [on] letting him go home" and she was "mostly concerned about his behaviors." She also stated that her landlord would not let D.B. back into the home.

¶ 13    On that same day, Wilson visited C.L.'s home. D.B., C.L., and Simonne Johnson, the family's intact worker from Hephzibah, were present at the time. During the visit, C.L. informed Wilson that she would leave D.B. home alone and she would stay with her boyfriend for multiple days at a time. She further offered that when D.B. was alone, he would engage in sexual activity with other men or boys through use of his cell phone. C.L. accused D.B. of being in one of the sexually explicit videos on his phone, but D.B. denied that it was him. Wilson stated that he had watched the video and he could not see any of the individual's faces. D.B. admitted to watching pornography on his phone.

¶ 14    Wilson further testified that C.L. was not interested in engaging in therapy with D.B. at that time. According to Wilson, C.L. stated that she did not need therapy but that D.B. did because "[h]e's the one that's perverted" and "[h]e's the one that's all f*** up." Wilson described C.L.'s

demeanor during the visit as provocative towards D.B. He felt as though C.L. was provoking, rather than helping, the situation because she used derogatory words aimed at D.B. It was Wilson's testimony that the words C.L. used toward D.B. "would tick anyone off in a situation" and "would cause anyone to defend themselves in an aggressive way."

¶ 15    During the home visit, Wilson also spoke with D.B. According to Wilson, D.B. stated that C.L. was "mistreating him because she's having a baby and her boyfriend didn't like him because he was gay and they [were] just trying to get rid of him so they can make space for the new baby." D.B. did not state that he did not feel safe in C.L.'s care but, rather, that he did not feel wanted. On cross-examination, Wilson clarified that, over the course of many conversations, D.B. did express that he did not feel safe with C.L.

¶ 16    That day, Wilson observed a physical altercation between C.L. and D.B. As described by Wilson, C.L. put D.B.'s phone down. D.B. grabbed the phone and ran out of the house. C.L. ran after him and grabbed him by the arm just in front of the building. D.B. snatched his arm away, and C.L. then jumped on D.B.'s back. D.B. flipped her over his back, and she began to scream. Wilson called 911, and D.B. ran away.

¶ 17    Afterwards, Wilson and his supervisor agreed to screen the case with the state's attorney. Wilson did not believe that the family would benefit from intact services because C.L. had previously refused to cooperate.

¶ 18    The State entered into evidence D.B.'s medical records from St. Mary's Hospital (St. Mary's) and the agency intact records from Hephzibah.

¶ 19    The records from St. Mary's indicated that on September 25, 2020, following a physical altercation with C.L. and several family members, D.B. was brought by the police to the emergency room. According to the hospital records, C.L. informed police that D.B. had expressed suicidal

ideation. The crisis worker at the hospital noted that D.B. had "superficial scratches" on his hands and he was "calm and cooperative" but he was also "observed to be hysterically crying" throughout the psychiatric evaluation for suicidal ideation. D.B. stated to hospital staff that he did not feel safe with C.L. D.B. stated to the crisis worker that C.L. "continues to beat on him" and he asked C.L. to call the police "because he [didn't] want to get hit anymore." He further stated that, on the prior evening, he ran away to his father's house but his father returned him to C.L. that morning. Finally, he stated that C.L. "tells him to 'play dumb in school' so that she can keep getting a disability check" but he actually "gets straight A's and is a good student."

¶ 20    C.L. reported to the crisis worker that D.B. "jumped her" the day prior, which resulted in cuts and bruises, but the crisis worker did not observe any injuries. C.L. expressed to the crisis worker that she was fearful of D.B. and that D.B. was having unprotected sex with boys. She further stated that D.B. was not doing well in school, was "getting in trouble" every day," and had threatened to kill himself. Additionally, an employee from Screening, Assessment, and Support Services (SASS) informed the crisis worker that she spoke with C.L., who stated that she wanted to relinquish her parental rights.

¶ 21    The grandmother spoke with the crisis worker and stated that C.L. is inappropriate with D.B., is verbally abusive, and steals his money to purchase drugs. D.B. was discharged the same day into the care of his grandmother with a safety plan in place.

¶ 22    On December 18, 2021, D.B. was brought to the emergency room at St. Mary's due to aggressive behavior and suicidal ideation. He remained there until December 20, 2021. D.B. was diagnosed with major depressive disorder, single episode, unspecified; suicidal ideations; attention deficit hyperactivity disorder (ADHD); and disruptive mood dysregulation disorder. The crisis worker's notes indicated that D.B. was brought to the hospital for a psychiatric evaluation because

he exhibited aggressive behavior at home, was sexually aggressive with a younger boy, and posted "TikTok" videos suggesting intentions to self-harm due to bullying about his sexuality. The hospital notes stated that there was an open DCFS case regarding D.B.'s inappropriate sexual interaction with a minor. D.B. reported to hospital staff that he and C.L. had been fighting and that C.L. believed he was acting inappropriately with his male friend who was at the house that day. An evaluation by SASS resulted in a recommendation for community stabilization via outpatient services. The emergency room doctor disagreed and recommended inpatient psychiatric treatment; however, the SASS worker was unable to find a bed at a psychiatric facility. D.B. was subsequently evaluated by a psychiatrist who determined that he did not require inpatient care, and he was cleared for discharge.

¶ 23    On December 20, 2021, C.L. was informed that D.B. was ready to be discharged; however, C.L. refused to take D.B. home asserting that he was a danger to her. The nurse contacted the police and DCFS based on child abandonment. With C.L.'s consent, D.B. was subsequently discharged to his paternal uncle.

¶ 24    The records from Hephzibah showed that, on February 10, 2021, 15-year-old D.B. was referred for services due to a January 28, 2021, incident. On that day, C.L. yelled at D.B. and asked him to "fight," and D.B. refused. C.L. began punching D.B. in the face and hit him with a lamp, causing bruising and scraped skin to his wrist and a bruised and swollen eye. D.B. reported that C.L. had been violent towards him "a lot." The recommended services included family therapy, anger management classes, mentoring for D.B., and parenting classes for C.L. C.L. was indicated for cuts, welts, and bruises. The documentation showed that C.L. agreed to engage in services.

¶ 25    Hephzibah created three service plans for C.L. dated March 26, 2021, June 17, 2021, and September 20, 2021. The plans required C.L. to engage in parenting classes, therapy, and anger

management classes; to keep appointments with service providers; and to speak to a caseworker before disengaging from services. All of these tasks were marked as "unsatisfactory progress/maintain interventions" on the September service plan.

¶ 26 The records also contained Johnson's "contact notes" following any contact with the family. Also included in the records are "supervisory" notes that detailed the information exchanged when Johnson met with her supervisor.

¶ 27 A June 11, 2021, contact note from Johnson states that C.L. was "frustrated" with D.B. and D.B. was "disrespectful" towards her when he spoke to her in a "feminine way." The note quotes C.L. stating to D.B., "Don't do that gay s*** with me, you are a boy at the end of the day and don't roll your eyes at me." D.B. reported that C.L. is "very dramatic." C.L. stated that D.B. did not have any family members to live with temporarily because he is "disrespectful" and "no one likes him." Johnson received D.B.'s father's phone number from C.L. and contacted him. The father informed Johnson that he "does not have a big home yet" but D.B. "can come stay with him for a couple of days."

¶ 28 A June 23, 2021, supervisory note states that C.L. did not want D.B. living with her and she reported that D.B. was with his paternal grandmother. That day, C.L. signed short-term guardianship paperwork.

¶ 29 A July 9, 2021, contact note reflects that D.B. was residing with his paternal grandmother, who requested temporary guardianship.

¶ 30 A July 14, 2021, contact note reflects that Johnson spoke with C.L., who was "rude" and "irritated." When asked whether she had completed the anger management classes, C.L. responded, "Why would I finish anger management when I'm done with DCFS and I don't have [D.B.] anymore."

¶ 31 A July 2021 supervisory note states that C.L. was uncooperative with the recommended services.

¶ 32 An August 13, 2021, contact note reflects that D.B.'s paternal grandmother reported that D.B. had been "breaking into cars, smoking marijuana, and drinking alcohol."

¶ 33 An October 2021 supervisory note indicates that D.B. could no longer reside with his paternal grandmother and C.L. did not want him back in her home.

¶ 34 A November 2021 supervisory note shows that D.B. and C.L. continued to have issues with their relationship and both refused to participate in services. C.L. also had not enrolled D.B. in school. The note stated that, during a meeting on November 3, 2021, C.L. became "irate" and was "not willing to cooperate with the plans for [D.B.]"

¶ 35 A December 1, 2021, contact note indicates that Johnson and her supervisor visited C.L.'s home and C.L. reported that D.B. is "very disrespectful" and that she locks the door because she is afraid of him. D.B. reported that C.L. gets upset about "small things." Johnson noted that C.L. interrupted D.B. and became very upset. C.L. stated to Johnson that she did not want D.B. there and DCFS should take him. C.L. became frustrated with Johnson and her supervisor and told them "[t]o get the f*** out."

¶ 36 A December 20, 2021, supervisory note reflects that D.B. was hospitalized for behavioral issues and C.L. reported that she did not want D.B. returned to her home. C.L. showed Johnson the sexually explicit videos she found on D.B.'s phone.

¶ 37 Both the State and the GAL rested.

¶ 38 C.L. then testified to the following.

¶ 39    As to the first physical altercation, which occurred in January 2021, C.L. testified that D.B. hit her and dragged her across the table. She defended herself and hit him back. Later that year, she became concerned about other behavior. She specifically stated that D.B. would not listen to her and he was stealing. When asked what he would steal, she stated that he stole birth certificates, Social Security cards from family members, and money. She knew about this because there were pictures of the stolen items on his phone. She stated that this was the result of D.B.'s father's side of the family because they "do a lot of scamming" and D.B. did not do "things like that until he went to his daddy's side." She also stated that D.B. would break into cars. C.L. claimed that she completed her anger management classes. She denied locking D.B. out of the house. She also testified that D.B. was 5 feet, 9 inches, and about 190 pounds at the time, while she was 5 feet, 8 inches, and 160 pounds.

¶ 40    In regard to the second altercation in December 2021, C.L. testified that Wilson started the fight. She stated that Wilson was cursing and yelling at D.B. and D.B. "flipp[ed] out." D.B. grabbed the phone out of C.L.'s hand and ran out of the house. C.L. ran after him, but she denied jumping on his back because she was "six months pregnant." C.L. testified that Wilson's testimony was not true. She denied calling D.B. any derogatory words.

¶ 41    C.L. further testified that she stayed at her boyfriend's home because she was afraid of D.B. She also stated that although she would stay at his home for multiple nights, she would go back to her home every day.

¶ 42    The hearing was continued to the next day.

¶ 43    On cross-examination, C.L. testified that she called D.B. after court the day prior, but she denied telling him that he needed to testify in court or she would lose custody of her baby. She

stated that she talked to D.B. about what happened in court and how some of what Wilson said was true and some of it was not true.

¶ 44    In rebuttal, the State called Johnson, who was assigned to the case in February 2021. She testified that C.L. never completed anger management class or any other intact services recommended for her. In her opinion, C.L. and D.B. struggled to have a good relationship with each other. When asked if Wilson's involvement in the case was neutral, Johnson responded that he was "mutual."[3]

¶ 45    On December 13, 2022, the parties presented their closing arguments. The State and the GAL requested findings of neglect due to injurious environment and lack of necessary care. C.L. requested a finding of dependency.

¶ 46    The circuit court found that the State had met its burden of proof, finding neglect due to injurious environment and lack of care. The court further stated that a dependency finding was not warranted because there was evidence that C.L. was not without fault.

¶ 47    On the written adjudication order, the court noted:

> "[M]other left minor for days so that she could be with boyfriend. [M]inor did not feel safe with mother. [M]inor engaged in sexual behavior after being alone. Mother declined therapy, stating that the minor is the problem and not her. Mother and minor engage in physical aggression towards each other."

¶ 48    The dispositional hearing took place over videoconferencing without objection on December 13, 2022.

---

[3]There is some dispute in the transcript as to whether "mutual" or "neutral" was the correct transcription.

¶ 49    The court admitted into evidence various integrated assessments, court reports, and a service plan.

¶ 50    Paris McClenton from DCFS testified that she was assigned to D.B.'s case in April 2022. She testified that D.B. was currently placed with his maternal aunt and prior to that he was in a foster home. She stated that he was on his fourth placement because of his aggressive behavior and failure to listen. D.B. was currently in the intake process to begin therapy again. In regards to D.B.'s relationship with C.L., she testified that they have maintained good communication over the phone. C.L. moved out of her sister's home to allow D.B. to stay there with his maternal aunt. McClenton testified that D.B. was diagnosed with ADHD and he needed a psychological evaluation. She stated that C.L. was not interested in reunification with D.B., but she had been engaging in individual therapy. C.L. had not visited D.B., and they have only engaged in phone conversations.

¶ 51    After the hearing, the court determined that it was in D.B.'s best interest to remove him from C.L.'s care and ordered that he be made a ward of the court. The court found C.L. unable to care for and protect D.B. Following a permanency hearing, the court entered a goal of "substitute care pending independence" for D.B.

¶ 52    This appeal followed.

¶ 53                                   II. ANALYSIS

¶ 54    C.L. claims that the circuit court's findings of neglect were against the manifest weight of the evidence. As to the finding of neglect due to an injurious environment, she argues that the court should have instead made a finding of no-fault dependency. We also note that C.L. does not challenge the circuit court's dispositional order, and as such, any claim as to the dispositional order is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 55                                    A. The Act

¶ 56      The purpose of the Act is to "secure for each minor subject hereto such care and guidance *** as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." 705 ILCS 405/1-2(1) (West 2020). The Act sets forth the procedures the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462-63 (2004). The process is initiated when the State files a petition for wardship and the minor is placed in temporary custody. *Id.* at 462. From there, the trial court conducts an adjudicatory hearing, where "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2020). If, at the adjudicatory hearing, the trial court determines that a minor is abused or neglected, the court then conducts a dispositional hearing. *Id.* § 2-21(2). At the dispositional hearing, the trial court determines "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.*

¶ 57      In adjudication proceedings, the State has the burden of proving allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Stated another way, the State must demonstrate that the abuse and neglect allegations are more probably true than not. *Arthur H.*, 212 Ill. 2d at 464. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.* at 463.

¶ 58      The reviewing court is deferential towards the trial court's findings of fact because "the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence." *In re Sharena H.*, 366 Ill. App. 3d 405, 415

(2006). A reviewing court will not reverse a trial court's ruling of neglect unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Arthur H.*, 212 Ill. 2d at 464.

¶ 59                                   B. Findings of Neglect

¶ 60     The Act defines a "neglected minor" as "any minor under 18 years of age *** who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being" or "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(a)-(b) (West 2020). "The term 'injurious environment' is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for her children." *In re M.D.*, 2021 IL App (1st) 210595, ¶ 24. Generally, " 'neglect' is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duties." *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002) (citing *In re Edricka C.*, 276 Ill. App. 3d 18 (1995)).

¶ 61     The State and the public guardian both argue that the findings of neglect were proper where C.L. was "physically aggressive, failed to complete services, failed to obtain services for her child, repeatedly failed to make an appropriate care plan, and was verbally and emotionally abusive."

¶ 62     We agree and find that the evidence in the record is more than sufficient to support both findings of neglect, although only a single basis for neglect needs to be proven. See *In re Faith B.*, 216 Ill. 2d 1, 14 (2005).

¶ 63     Our review of the record shows that D.B. had a number of behavioral issues. Yet C.L. did not provide the necessary care to resolve those issues. She failed to participate in and complete various intact services offered and instead made the situation worse by engaging in mutual combat,

provoking D.B. with derogatory language, refusing to allow him into the home, and leaving him alone overnight on multiple occasions.

¶ 64    In particular, the evidence shows that D.B. suffered from suicidal ideation, depression, and issues with bullying due to his sexual orientation. To make matters worse, C.L. was also verbally abusive towards D.B., particularly in regard to his sexual orientation. She yelled at him for acting or speaking in a feminine manner, and she called him derogatory names. She was demeaning in her comments and chided him regarding his sexual orientation. Concerning D.B., C.L. reportedly made statements such as "[h]e's the one that's perverted," "[h]e's the one that's all f*** up," and "[d]on't do that gay s*** with me."

¶ 65    We have not overlooked the evidence that shows that D.B. may have engaged in inappropriate sexual activity, as well as criminal activity, including stealing from family members and breaking into cars. Nonetheless, instead of protecting D.B. and taking appropriate corrective measures, C.L. refused to allow D.B. into the home and would not pick him up from the hospital. The record is devoid of any evidence that C.L. attempted to find alternative living arrangements for D.B., and on at least one occasion, D.B. ended up at a shelter. When D.B. was in her care, C.L. left D.B., a seemingly troubled teen, at home alone for extended periods of time, including overnight. Additionally, on one occasion, C.L. informed a crisis worker that she wanted to relinquish her parental rights. D.B. reported that he did not feel that C.L. wanted him and that she was trying to get rid of him to make room for her new baby. There was also testimony that D.B. did not feel safe with C.L. "A finding of neglect is appropriate where a minor is not receiving care necessary for his or her well-being, including shelter." *Christina M.*, 333 Ill. App. 3d at 1035. We cannot say that this evidence demonstrates a safe, nurturing shelter for D.B or that C.L. provided

the necessary care that the circumstances warranted. Instead, the evidence supports findings of lack of necessary care and injurious environment.

¶ 66    Moreover, C.L.'s refusal to engage in therapy and her failure to complete any intact services also demonstrates her lack of concern for D.B.'s well-being or her relationship with him as his mother. Despite C.L.'s claims that she completed anger management classes, there is nothing in the record to support that assertion and Johnson specifically testified that she had not completed them. There was also evidence in the record that C.L. was verbally aggressive with DCFS workers on more than one occasion. It is clear that C.L. had little interest in repairing her relationship with D.B., and she lacked respect for the individuals offering assistance to her. Thus, a lack of care is evident from this record where C.L. has displayed a "willful *** disregard of parental duties." See *id.* at 1034; see *In re J.S.*, 2012 IL App (1st) 120615, ¶ 36 (affirming the neglect finding, despite the minor's extensive behavioral problems and criminal activity, because the mother had refused to allow the minor to return home on multiple occasions and refused all services offered to her).

¶ 67    Regarding the physical altercations, C.L. admitted to hitting D.B. in January 2021 and Wilson observed minor injuries on D.B. at that time. According to the Hephzibah records regarding that incident, D.B. reported that C.L. punched him and hit him with a lamp, causing bruising and scraped skin to his wrist and a bruised and swollen eye. He also reported that C.L. had been violent towards him "a lot." However, according to C.L., on that day, D.B. hit her and dragged her across the table. Regardless of who was the initial aggressor in these altercations, the evidence reflects C.L.'s inability to de-escalate situations and her engagement in mutual combat with her minor son, to which she admitted, is an inappropriate response to his behavior. See *In re J.C.*, 2023 IL App (1st) 221345-U, ¶¶ 2, 66 (affirming the finding of neglect based on injurious environment where,

even if the mother was acting in self-defense, the minor "was injured while in the mother's care and during a physical quarrel" between them).

¶ 68    There are also competing accounts of the December incident. Wilson testified that he observed C.L. jump on D.B.'s back because he had grabbed his phone and ran out of the home. D.B. then flipped her over his back. He believed that C.L. was provoking aggressive reactions from D.B. through her use of derogatory and explicit language.

¶ 69    However, C.L. claims that Wilson's account of the December 2021 altercation was not true and that the court should have accepted her account instead. According to C.L., she did not call D.B. any derogatory names and she did not jump on his back. The court, as the trier of fact, clearly did not accept C.L.'s version, and we will not substitute our judgment for that of the trier of fact in determining the credibility of witnesses. See *In re D.F.*, 201 Ill. 2d 476, 499 (2002). It was not unreasonable for the circuit court to find C.L.'s account not credible, particularly where she had been untruthful about completing anger management classes. Her account also alleged that Wilson, the DCFS caseworker, was yelling at D.B. and cursing at him; however, Johnson, who was present that day, testified that she believed Wilson was "mutual" and she affirmed that he was "trying to observe [and] obtain information about the case overall." This testimony does not support C.L.'s assertion that Wilson was acting inappropriately or aggressively towards D.B. Based on the record, it was reasonable for the court to find Wilson's account credible.

¶ 70    Nonetheless, C.L. specifically argues that the evidence failed to establish that D.B. was neglected where she created appropriate care plans and that the length of time D.B. was left alone was vague and should not have been a basis for finding lack of care. We disagree.

¶ 71    As evidence of a "reasonable and thoughtful care plan," C.L. points to the period of time in the summer of 2021 when she "sent" D.B. to live with his grandmother and she "signed over

guardianship so that his grandmother could provide appropriate care for D.B." She then states that it was D.B.'s own bad behavior that caused him to be removed from his grandmother's care. We first note that C.L. testified that D.B.'s father's family was involved in "scamming"; however, she still made arrangements for him to reside with his paternal grandmother. In any case, although she may have entrusted the grandmother with care of D.B., C.L. did nothing herself to improve the environment and her relationship with D.B., which would allow him to once again reside with her. In fact, after D.B. began living with his grandmother, C.L. refused to participate in any services and stated that DCFS should no longer be involved with her because D.B. did not live with her. Finally, a single instance where C.L. may have arranged appropriate care for D.B. does not negate the multiple instances where she refused to allow him into the home or she left him alone for days at a time. As such, this contention fails.

¶ 72    As to the length of time that D.B. was left alone, it is clear from the testimony of both Wilson and C.L., herself, that she intentionally left D.B. home alone overnight. She claimed that she would check on him during the day and the boyfriend lived nearby. Even if true, that does not negate the fact that D.B. was left alone at night despite ongoing concerns for his sexual behavior as well as his emotional wellbeing. In any case, this was not the sole basis for the court's finding of neglect.

¶ 73    On this record, we conclude that the circuit court's findings of neglect were not against the manifest weight of the evidence.

¶ 74                                C. Dependency

¶ 75    C.L. also argues that the circumstances in this case support a finding of no-fault dependency, rather than neglect. She cites to *In re Christopher S.*, 364 Ill. App. 3d 76 (2006), for support of this argument.

¶ 76    The Act defines a dependent minor, in relevant part, as a minor "who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect or lack of concern by his parents." 705 ILCS 405/2-4(1)(c) (West 2020).

¶ 77    The circuit court stated on the record that it could not find no-fault dependency where C.L. bore at least some responsibility for the breakdown of her relationship with D.B. The evidence in the record supports that conclusion.

¶ 78    First, there were multiple instances where C.L. did not allow D.B. back into her home, which supports the allegation of a lockout, and there was nothing to suggest she sought to make alternative arrangements for D.B. She also repeatedly stated that she did not want D.B. and even went so far as to state that she was willing to relinquish her parental rights.

¶ 79    Second, C.L. did not demonstrate a continual good faith effort to restore her relationship with D.B. She failed to complete her anger management classes, was not interested in therapy, and stated that she did not want to participate in intact services when D.B. was temporarily removed from her care. She repeatedly blamed D.B. for the altercations and never acknowledged her own role in them or her responsibility to de-escalate situations.

¶ 80    Finally, C.L. was concerned with D.B.'s sexual and criminal behavior and yet left him home alone while she stayed at her boyfriend's house for one or two days. Despite her assertion that she would come home briefly during the day, her decision to leave her minor child who was allegedly engaged in criminal and sexual activity indicates a lack of concern. See *In re Diamond M.*, 2011 IL App (1st) 111184, ¶ 28 (finding that the mother's actions demonstrated a complete lack of concern for her child's well-being and were not consistent with no-fault dependency). There was also evidence in the record suggesting suicidal ideation and issues with bullying, which

are yet further reasons to not leave D.B. home alone for extended periods of time. Based on the record before us, we conclude that the evidence presented supported the court's refusal to find dependency and that an opposite conclusion is not clearly evident. See *In re L.H.*, 384 Ill. App. 3d 836, 842-43 (2008) (stating that no-fault dependency can be found only where there is no fault, no neglect, and no lack of concern by the parents).

¶ 81       Turning to *Christopher S.*, we disagree with C.L.'s argument that it has "certain parallels" with the instant case. In *Christopher S.*, the petition for wardship of the minor was based on allegations that the minor had been "locked out," specifically that his adoptive parents had refused to pick him up from the psychiatric hospital following his discharge and refused to allow him back into their home. *Christopher S.*, 364 Ill. App. 3d at 79. The respondents informed the DCFS investigator that the minor was out of control and threatened violence against the family. *Id.* The respondents attempted to arrange for the minor to reside at Mercy Home, for which they would pay, but Mercy Home denied the minor admission. *Id.* The respondents eventually found a biological aunt to care for the minor. *Id.* At the adjudicatory hearing, there was extensive evidence regarding the minor's behavioral problems, which included aggression, violence, and criminal acts. *Id.* at 79-81. The respondents attempted to arrange alternative housing, as well as therapy for the minor, but nothing was successful. *Id.* After the lockout, the respondents continued to assist the minor in finding housing and treatment; in fact, the respondents contacted over 40 different residential placement homes on the minor's behalf. *Id.* at 83. The trial court found that the minor was dependent through no fault of the respondents, and on appeal, this court affirmed the finding of no-fault dependency. *Id.* at 84, 88-89. Specifically, this court found that the respondents showed "great parental concern for [the minor's] well-being" and "respondents made every effort to arrange an alternative care they could afford." *Id.* at 89.

¶ 82　We find *Christopher S.* to be factually distinguishable from the case before us. As stated, C.L. repeatedly voiced that she did not want D.B. in her home and she did not make any efforts to find alternative placements for him. She would leave him alone in the home, despite being aware of his sexual behavior and suicidal ideation. She did not de-escalate situations, rather she appeared to provoke physical altercations. Additionally, she failed to complete any offered intact services and refused to participate in therapy. Thus, unlike the respondents in *Christopher S.*, we cannot say that C.L. made every reasonable effort available and that she offered to improve her relationship with D.B. and to provide the necessary care for him. See *Diamond M.*, 2011 IL App (1st) 111184, ¶ 27 (distinguishing *Christopher S.* because "[t]here is no evidence in the record that respondent made any remotely comparable efforts to find a residence for [the minor]"); *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 29 (distinguishing *Christopher S.* because the mother "showed no interest in engaging in support services" and "refused to allow [the minor] to return home" after his hospitalization for mental health issues).[4]

¶ 83　Accordingly, we are not persuaded that the circuit court should have made a finding of no-fault dependency, and we affirm the circuit court's adjudication of D.B. as a neglected minor.

¶ 84　　　　　　　　　　　III. CONCLUSION

¶ 85　For the reasons stated, we affirm the judgment of the circuit court.

¶ 86　Affirmed.

---

[4]This case and *Christopher S.* are inversely distinct. In *Christopher S.*, the GAL's claimed error on review was the court's finding of no-fault dependency, as opposed to neglect. 364 Ill. App. 3d at 85-86. Here, C.L.'s claimed error on review is the trial court's finding of neglect as opposed to no-fault dependency. In either case, consistent with our standard of review, we must be largely deferential to the circuit court's findings. See *Christina M.*, 333 Ill. App. 3d at 1034.

---

***In re D.B.*, 2023 IL App (1st) 230059**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-01180; the Hon. Demetrios Kottaras, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Kathryn Pelech, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Nicholas A. Youngblood, of counsel), guardian *ad litem*. |