2024 IL App (1st) 231166

No. 1-23-1166

Second Division
January 31, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| | ) | Appeal from the |
| IN THE INTEREST OF K.C., a minor, | ) | Circuit Court of |
| Minor/Respondent-Appellee, | ) | Cook County, Juvenile Justice |
| | ) | and Child Protection |
| (People of the State of Illinois), | ) | Department, Child Protection. |
| Petitioner-Appellee, | ) | Division. |
| | ) | |
| v. | ) | |
| | ) | No. 20JA663 |
| S.W., | ) | |
| | ) | |
| Mother-Respondent-Appellant). | ) | Honorable |
| | ) | Maxwell Griffin, Jr., |
| | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**OPINION**

¶ 1     This case comes to us following ongoing proceedings concerning the adjudication of a minor child, K.C., who was previously found to be abused and neglected pursuant to section 405/2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3) (West 2020)). Following the entry

of an adjudication order that deemed K.C.'s biological mother and respondent-appellant, S.W., unable to care for K.C., the trial court awarded temporary guardianship to the Department of Children and Family Services (the Department). K.C. was also appointed a guardian *ad litem* (GAL) from the Office of the Public Guardian (GAL). After multiple continuances, as well as disposition and permanency hearings where S.W. was deemed unable to care for K.C., S.W.'s counsel filed a motion to return K.C. and his minor sibling to her care. The court, finding S.W. able to care for K.C., granted the motion and allowed K.C. to return home pursuant to an order of protection.

¶ 2 However, following the filing of an emergency motion by K.C.'s GAL which alleged that S.W. had violated the order of protection, the court subsequently vacated the order and returned custody of K.C. to the Department. Immediately after the hearing, S.W. filed a combined motion for a finding of no reasonable efforts and to compel the Department to provide family preservation services. S.W. also filed a motion to reconsider the court's vacatur of the order of protection. Both motions remained unaddressed by the court until a permanency hearing was held. At that hearing, the court entered a permanency order, finding S.W. unable to care for K.C., and set a permanency goal of "return home" within 12 months. The court also denied S.W.'s motion to reconsider as well as the motion for no reasonable efforts.

¶ 3 On appeal, S.W. argues that the trial court erred in denying her motion for a finding that the Department had not made reasonable efforts to prevent K.C.'s removal from the home and to preserve the reunification of the family. However, because we lack jurisdiction, we do not reach the merits of S.W.'s claim and must dismiss this appeal.

¶ 4                                 I. BACKGROUND

¶ 5                              A. Petition for Wardship

- 2 -

¶ 6    Our review of the record reveals a significant amount of motion practice, particularly by S.W. during the relevant time period concerning this appeal. We have attempted to cull through the record to recite only those facts necessary for an understanding of the procedural posture of the case and of our disposition.

¶ 7    S.W. is the biological mother of K.C., as well as two other children who were all minors at the time this case was commenced.[1] On April 22, 2020, the Office of the Cook County State's Attorney (State) filed a petition for adjudication of wardship on behalf of all three children. The petition alleged that K.C. was neglected and abused pursuant to sections 405/2-3(1)(b) (705 ILCS 405/2-3(1)(b) (West 2020)) and 405/2-3(2)(ii) (705 ILCS 405/2-3(2)(ii) (West 2020)) of the Act. According to the petition, on or about September 29, 2019, S.W. and one of her children had been involved in a physical altercation that resulted in the minor sustaining a concussion. Additionally, in November 2019, K.C. and his other siblings observed S.W. and one of K.C.'s sibling's fathers involved in a domestic altercation, which resulted in the Department opening an "intact case." Finally, on or about April 16, 2020, the petition alleged that S.W. had left one of her minor children to care for K.C. and their other siblings while she travelled out of state, and later returned home with one of her children's fathers with whom she shared a history of domestic violence.

¶ 8    The petition indicated that both S.W. and one of K.C.'s sibling's fathers had prior indicated reports for neglect and abuse. S.W. had also been diagnosed with bipolar disorder and major depression and anxiety disorder, and had a history of being inconsistent with psychiatric services, which had resulted in a psychiatric hospitalization earlier that year. S.W.'s treating psychiatrist

---

[1]Much of the record also concerns S.W.'s other biological children, M.B., age 17 at the time of petition, and C.W., age 11. For purposes of our disposition, we recite only such facts as are particular to K.C.

was further concerned that S.W. had been abusing her psychotropic medication, and was currently "psychologically unstable" and suffered from "uncontrolled" psychiatric issues. The petition also reported that K.C.'s siblings characterized S.W. as "scary and erratic" when S.W. was not compliant with her prescribed medication. The petition also alleged that K.C. had been diagnosed with attention-deficit hyperactivity and anxiety disorder, and had been prescribed psychotropic medication but was not taking it. S.W.'s psychiatrist further opined that S.W.'s "psychological instability affect[ed] the children and worsen[ed] their depression."

¶ 9                    B. Temporary Custody Hearing

¶ 10    On April 22, 2020, the State filed a motion for temporary custody with supporting affidavits. Therein, the State argued that there was probable cause that K.C. had been neglected and abused, and that there was "immediate and urgent necessity" to take K.C. into temporary custody. The motion re-incorporated the facts alleged in the petition for wardship, and further argued that "reasonable efforts cannot prevent or eliminate the necessity of removal of the minor from the home." In support of the motion, the State attached the affidavit of Kharyn Johnson-Wren, which detailed the Department's investigation into the matter.[2]

¶ 11    On April 22, 2020, a temporary custody hearing was held.[3] A written order entered that day, finding that: probable cause existed that K.C. was being abused and neglected; an immediate and urgent necessity existed to support his removal from the home as continuation in the home was contrary to his welfare; reasonable efforts had been made but had not eliminated the immediate and urgent necessity to remove him from the home; and it was in K.C.'s best interest to be removed

___

[2] The form affidavit provides various boxes to be checked by the affiant intended to indicate the affiant's status as either an investigator, caseworker, or private agency caseworker. None of the boxes are checked on the form. Nevertheless, we presume that Johnson-Wren was employed by the Department.

[3] The record does not include a transcript of the proceeding.

from the home. Temporary custody was granted to the Department, and a separate order was entered regarding S.W.'s visitation rights, which included supervised day visits with the minors and required conditions. Finally, the court appointed a guardian *ad litem* for all three children.

¶ 12                                    C. Case Continuances[4]

¶ 13    The matter was continued numerous times for status and attempts to notify K.C.'s biological father of such proceedings.[5] During that time, various permanency and disposition orders were entered that re-affirmed K.C.'s status as a ward of the court, as well as S.W.'s inability to care for him.[6]

¶ 14    On May 16, 2022, an adjudication order was entered for K.C. The court found K.C. to be "abused or neglected" pursuant to section 405/2-3 of the Act based on "lack of care" and "injurious environment[,]" inflicted by S.W. The court based its findings on "credible evidence of [domestic violence] in the home[,] as well as [S.W.] leaving the children in the care of the minor [K.C.'s sibling]," which the court found to be an "inappropriate care plan given the facts of the cases." However, the court declined to make a finding of dependency, as the "evidence regarding the mother's mental illness [did] not rise to th[at] level[.]" The court further set the case for a

---

[4]Perhaps not unusual given the period of time which has elapsed since the case began, we note that at least three judges have presided over this matter since its inception, beginning with the Honorable Bernard J. Sarley. Notably, on the date that the order of protection was entered as to K.C. in accordance with the minor's return home, a different judge presided over the matter who was later succeeded by Judge Griffin.

[5]K.C.'s biological father admitted parentage of K.C. during court proceedings on January 7, 2021, and the court therefore entered a paternity finding via written order that day. However, throughout the entire course of proceedings, K.C.'s biological father was deemed unable to care for him as shown by numerous court orders and he remained relatively uninvolved for most of the proceedings.

[6]During this time, K.C. and C.W. were placed in the custody of their maternal grandfather.

disposition hearing on July 25, 2022, which was continued by agreement multiple times throughout the year.[7]

¶ 15    On July 25, 2022, the trial court entered a written permanency order. The order did not recite a permanency goal, but indicated that the Department had "made reasonable efforts in providing services to facilitate achievement of the permanency goal." The matter was scheduled for another permanency hearing and "continued disposition" hearing.

¶ 16    On November 18, 2022, the court conducted a multi-day disposition hearing and entered a written disposition order for placement that same day.[8] Therein, K.C. was adjudged as a ward of the court; S.W. was found "unable for some reason other than financial circumstances alone to care for, protect, train or discipline" him; and "reasonable efforts ha[d] been made to prevent or eliminate the need for removal of the minor from the home." The court further found that "appropriate services aimed at family preservation and family reunification ha[d] been unsuccessful." Custody was again granted to the Department. The court also entered a separate written "order on visiting" that continued to allow S.W. unsupervised day and overnight visits with K.C. at the Department's discretion.

¶ 17    Finally, the court also entered a written permanency order with a "return home goal" of 5 months for K.C. The order stated that S.W. had made "substantial progress" toward K.C.'s return home goal. The court further found that the Department's service plans were "appropriate and reasonably calculated to facilitate achievement of the permanency goal" and that the Department

---

[7]The order expressly noted that the parties had waived the statutory requirement to hold the dispositional hearing within 30 days of the court's order. See 705 ILCS 405/2-21(3) (West 2020)).

[8]This transcript is not included within the record.

had made "reasonable efforts in providing services to facilitate achievement" of the goal. However, the selected goals could not "immediately be achieved" because "services [were] ongoing."

¶ 18          1. S.W.'s Motion to Return Home and the Order of Protection

¶ 19    On January 4, 2023, S.W. filed a motion for extended visitation with the children. Therein, she indicated that she had completed or was engaged in all required reunification services, and currently enjoyed unsupervised day and overnight visits with the minors without any concern. S.W. further alleged that, as shown at the November 18 disposition hearing, both minor children, including K.C., wished to return home.[9]

¶ 20    On January 9, 2023, a hearing was held on S.W.'s motion. S.W.'s counsel called Mia Nalls-Walker as a witness, who testified that she was a caseworker at Ada S. McKinley Community Services and had served the family since August 2021. According to Nalls-Walker, S.W. had been assessed by the Department for both psychiatric services and individual therapy with a focus on domestic violence issues. S.W. had completed her required parenting classes and most of the sessions required by the Department. Nalls-Walker further testified that S.W. had "made progress" in those services and S.W.'s therapist had reported that she had successfully completed therapy services in May 2022. However, although the therapist had determined that S.W. was no longer in need of therapy or medication, Nalls-Walker testified that the agency still had concerns regarding the mother's mental health.

¶ 21    Nalls-Walker further testified that, since the week of December 20, 2023, K.C. and C.W. had been home with S.W. on an extended visit, and both had expressed an interest to return home.

---

[9]Additionally, the motion alleged that on December 17, 2022, a hotline call had been made to the Department concerning a potential altercation between K.C. and his foster parent, where K.C. had allegedly been placed in a chokehold and then sent to his room. The relationship between the minor children and the foster parent was a contentious subject between the parties but is not relevant to our disposition at this time.

Prior to the extended visits, S.W. had been awarded unsupervised day and overnight visits without any concerns. As such, the agency was in agreement at this time that it was in K.C.'s best interest to return home, so long as an order of protection was put in place to allow for Nalls-Walker to continue to visit the minors and that both children continue with their ongoing therapy sessions. Nalls-Walker indicated that K.C. was on the waiting list for a new therapist, but she had received an email that day that he now had a potential placement. Nalls-Walker stated that S.W. wanted to choose the therapist for both children as she had concerns about C.W.'s therapeutic relationship. Although the agency did not share the same concerns, it believed it was "absolutely" in K.C.'s best interest to begin therapy as soon as possible and that both children required that support for their transition back home. Nalls-Walker indicated that S.W. was not yet aware of the new potential therapist as the agency was waiting for the court to enter an order on that issue today.

¶ 22   Upon examination by the State, Nalls-Walker testified that it was the agency's recommendation that K.C. should continue attending the same therapeutic school in which he was currently enrolled as he had an independent educational plan (IEP) in place. Nalls-Walker further indicated that S.W. had concerns about K.C.'s transportation to and from school, but that such concerns would be addressed by the school district. Upon examination by K.C.'s GAL, Nalls-Walker testified that she had been to S.W.'s home once after the children returned home for their extended visit. No one had been home at the time of her visit, but the residence had seemed "safe" and "appropriate." S.W. had also requested services for family therapy, and the agency would work with her to identify such community resources.

¶ 23   Following Nalls-Walker's testimony, the court orally found that S.W., although previously determined unable to care for the minor children, was now "fit, willing and able to care for, protect, train, and discipline the minors." As such, K.C. and C.W. were allowed to return home pursuant

to an order of protection. The court further ordered that the case return for a progress report in 3 months and that, "if it is in the best interest of the children to close the case *** in three months, that will be the order." With regard to the conditions of the order of protection, the court determined that the "usual conditions" would be in place, in that S.W. would "continue to cooperate with all reasonable requests" of the Department. In addition, the court ordered the continuation of therapy for both minors with their current and new providers.

¶ 24 Subsequently that day, the court entered a written "original" disposition order. Therein, the court found that K.C. had previously been adjudged a ward of the court on November 18, 2022, but S.W. was now "fit, able, and willing to care for, protect, train, and discipline" him. The court further found that "[r]easonable efforts have been provided to make it possible for the minor to return to the parent" and that "[a]ppropriate services aimed at family preservation and family reunification have been successful." As such, the court ordered that K.C. should be returned to S.W.'s custody in accordance with a "405/2-24 Order of Protective Supervision."

¶ 25 The court also entered a "Supplemental Protective Order" outlining required conditions for S.W. With regard to K.C., S.W. was ordered to enroll and ensure his attendance in individual therapy services with a provider identified by the Department. S.W. was also ordered to keep K.C. at his current school and arrange for his transportation. Finally, the court also entered an extensive and detailed "order of protection" against S.W., which included, inter alia, cooperating with all reasonable requests of the Department, ensuring an appropriate care plan for the minors and notifying the Department prior to any change in residence, ensuring school attendance, and participation in counseling services.

¶ 26 2. GAL's Emergency and Supplemental Motion

¶ 27 On March 8, 2023, K.C. and C.W.'s GAL filed an "Emergency Motion to Make a Finding that Mother has Violated the 2-24 Order of Protection." The GAL argued that since the minors had been returned home, S.W. had not complied with the conditions set forth within the order of protection.

¶ 28 First, the Department argued that S.W. had not supported K.C. at his therapeutic school as his attendance had noticeably decreased, he arrived at school sleep-deprived and often slept during the day, and was exhibiting "defiant, uncooperative, [and] dysregulated" behavior. The motion further stated that when the school contacted S.W. via email in February 2023 regarding K.C.'s attendance issues, S.W. blamed K.C.'s lack of attendance on bus transportation issues. On March 6, 2023, the school also emailed S.W. regarding K.C.'s declining behavior and academic performance. In response to the email, S.W. blamed the school for K.C.'s decline and sent a video which depicted K.C. and herself mocking the school staff. Although the Department conceded that "technically" S.W. had not violated the order of protection regarding school and attendance, her conduct and interaction with school administrators was "purposefully undermining the intent" of the order. As such, the Department requested that S.W. participate in collaborative meetings with K.C.'s school.

¶ 29 Second, the Department reported that S.W. had told K.C. and C.W that she was being evicted from her current home and planned to leave the state immediately, which the Department confirmed through its own independent research. When the Department confronted S.W. with these plans, S.W. indicated that she would be taking the minors on a vacation to Michigan for a month, and further intended to get them Canadian passports. The Department attempted to provide S.W. with an application for emergency rental assistance, which she did not complete, and were thus concerned that S.W. would remove K.C. and C.W. from the state. As such, the Department

requested an order prohibiting S.W. from removing the minors without express permission, as well as proof of housing.

¶ 30     Finally, the Department argued that S.W. was further violating the order of protection as K.C. was not currently enrolled in therapy, despite the availability of a therapist by the referring agency. Although K.C. maintained a strong desire to remain with his mother, the Department was concerned that S.W.'s "erratic" behavior was affecting K.C.'s behavior and mental health. The Department further requested that S.W. be evaluated by a psychiatrist and immediately enroll K.C. into services with his new therapist.

¶ 31     On March 10, 2023, the court held a hearing on the GAL's motion. S.W. appeared remotely and by counsel, and indicated that K.C. was not in school because he was "scared" and "having issues." She further stated that he was in need of mental health resources, which he had not been receiving and for which she had "repeatedly" asked. S.W.'s counsel further indicated that his client was amenable to the GAL's request for psychiatric services, but would require financial assistance. The GAL reported that the Department had a "serious concern" that the mother was entering a "manic phase" and would soon be evicted from her home. After argument, the court entered and continued the motion to March 16, but orally ruled that S.W. was not to remove K.C. from the state.

¶ 32     That same day, the court entered a series of additional written orders. Although the court entered and continued the GAL's motion to March 16, it also entered a form order entitled "disposition order," but which expressly provided that the cause was coming on the GAL's motion. Therein, K.C. was adjudged as a ward of the court and S.W. was found unable to care for him. The court further found that "reasonable efforts ha[d] been made to prevent or eliminate the need for removal of the minor from the home" and that "appropriate services aimed at family preservation

and family reunification have been unsuccessful." The court also vacated the order of protection against S.W. and returned custody of K.C. to the Department for further placement. Finally, a separate written order prohibited S.W. from removing the minors from the state without further order of court.

¶ 33                              3. March 16 Hearing

¶ 34    On March 16, 2023, the GAL filed a "Supplemental Emergency Motion to Violate and Vacate the 2-24 Order of Protection." Therein, the GAL alleged that K.C. had not been in school since March 8, 2023. Although S.W. had met with school officials on March 13, S.W. indicated that she and K.C. were no longer in Cook County and refused to disclose their location. On March 14, K.C.'s caseworker, Nalls-Walker, met with K.C. and S.W. remotely, during which time S.W. further confirmed that the two were no longer in Cook County and did not provide any new address. As such, the GAL argued, S.W. continued to violate the terms of the order of protection, as well as the court's last order which prohibited S.W. from taking K.C. out of the state.

¶ 35    On that same date, a hearing was held on the GAL's motions. Nalls-Walker testified that on March 6, 2023, she became aware that K.C.'s sibling, C.W., had informed their school administrators that S.W. planned to take the two of them to Michigan by the end of the week. Nalls-Walker spoke with C.W. on the phone that night, and C.W. indicated that they wished to be removed from their mother's home as she and S.W. had several verbal altercations. C.W. also reported that S.W. did not want them to continue therapy with their current provider. As such, the agency believed it was in the best interest of the minor to be removed from the home.

¶ 36    Upon examination by S.W.'s counsel, Nalls-Walker testified as follows. S.W. had not been "upfront" about moving to Michigan, but had stated to her that once the "case was closed," she wanted to move where she had "family" and support." C.W. had experienced other verbal

altercations with S.W. and had decided to speak up once S.W. indicated that the family would be moving because C.W. did not wish to go. It was also the agency's position that it was the "responsibility of the parent" to ensure that the minors continued treatment with their respective therapists.

¶ 37    The court then questioned C.W., who further confirmed that S.W. had already left for Michigan and had taken K.C. with her. Ultimately, the court found, with regard to C.W., that S.W. had violated the order of protection, and further vacated the order. The court also orally entered a "modified disposition order" finding S.W. unable to care for C.W. and placing the minor within Department's custody.

¶ 38    The court then proceeded to hear testimony regarding K.C. Upon examination by K.C.'s GAL, Nalls-Walker testified that in February 2023, K.C.'s school psychologist informed her that he had been missing class since February 22. When he had been present, he had been described as "dysregulated," "spiraling," and "disruptive" to other students and teachers. The school reached out to S.W. to inquire about his whereabouts, and S.W. indicated that it was a "transportation" issue. The school responded that transportation was not an issue and that it would support the family. Later that month, the school reported that the transit issues had been resolved.

¶ 39    On March 6, 2023, Nalls-Walker received another report from the school that K.C. was absent from class and continued to otherwise be a "constant disruption." The school psychologist again reached out to S.W. via email to address the behavior. In response, S.W. sent back two emails. The first contained a written response which blamed the school on K.C.'s behavior. The second contained a video where S.W. taped herself asking K.C. questions about school, including the names he had called his teachers, and laughing together.

¶ 40 On March 8, Nalls-Walker received another report from the school that K.C. had not been present that day, and later learned that K.C. had not been in school since March 8. The school had a meeting with S.W. on March 13, which Nalls-Walker was unable to attend. She followed up with the school psychologist after the meeting, and the school informed her that S.W. had refused to tell them where she and K.C. were located. However, S.W. indicated that she was no longer in Cook County and did not plan to return K.C. to school.

¶ 41 On March 14, S.W. reached out to Nalls-Walker to inform her that the Cook County Sheriff wanted to speak with her after K.C.'s school called for a wellness check. Nalls-Walker asked S.W. where she was located. S.W. refused to give an address, but indicated that she was in Michigan and had no plans to return to Illinois. On March 15, Nalls-Walker visited the family home and found it empty.

¶ 42 Upon examination by the State, Nalls-Walker testified that, as of two weeks ago, K.C. was off the waiting list for therapy. The agency believed he was in need of school and therapeutic services, but S.W. had not enrolled him in any, even after Nalls-Walker informed her that a therapist was available. It was also the agency's position that the order of protection as to K.C. should be vacated as S.W. had failed to cooperate with the court order to ensure K.C.'s safety. The agency also sought an interstate child protection warrant.

¶ 43 Upon examination by S.W.'s counsel, Nalls-Walker testified as follows. She had informed S.W. on January 6 that K.C. had been placed on the waiting list for therapy, but services became available on February 13. She sent the therapist's information to S.W. via text and email. She admitted that S.W. had expressed concerns about K.C.'s school's ability to regulate his behavior. S.W. told Nalls-Walker that she was in Michigan because she was being evicted and did not have a place to stay, and had called a few shelters for placement to no avail.

¶ 44 Nalls-Walker admitted that S.W. had asked for housing assistance from the agency. On March 1, Nalls-Walker sent an application for "Norman funds"[10] to S.W., to which she responded that she needed assistance in completing the form. On March 4, Nalls-Walker visited S.W. at her home and provided her with physical copies of the form. Nalls-Walker told S.W. that she would collect the completed forms from her on Monday, March 6. S.W. had previously completed the same forms in November 2022, with the only difference now being her unemployment. Nalls-Walker had not been aware of the family's pending eviction, as S.W had informed the agency that she had paid her rent for January and February of that year. S.W. had told her that she had been fired from her job while trying to put together a safety plan and obtain childcare for K.C. Nalls-Walker admitted that S.W. had requested that the agency assist her with putting together a safety plan in December 2022. However, the agency had not provided assistance for childcare.

¶ 45 Next, the court questioned K.C., who confirmed that he was in Michigan and his preference to remain with his mother. He did not know how long he had been in Michigan and was not going to school there. He believed he was not enrolled in school because he did not have housing. He had not seen a therapist in Michigan and knew he had to return back to Illinois to receive services, but stated "we can't do that."

¶ 46 Last, the State questioned S.W. She indicated that she was staying at her mother's house in New Baltimore, Michigan, as she did not have housing in Illinois. She and K.C. had stayed at a different address previously. She had been in Michigan since March 11 and was homeless.

¶ 47 After hearing argument, the court orally ruled to vacate the order of protection. It further stated that it would enter a "modified disposition order" that again designated K.C. as a ward of

---

[10]"Norman funds" refer to a program administered by the Department that offers cash assistance to help attain or maintain housing stability.

the court and that S.W. was unable to care for him. The court further found that S.W. had violated the March 10 order not to remove K.C. from Illinois. Finally, the court stated that it would issue an interstate child protection warrant for K.C.[11]

¶ 48    The court also entered a series of written orders that day which memorialized many of its oral findings above. In a "modified disposition order," the court also found that "[r]easonable efforts have been made to prevent or eliminate the need for removal of the minor from the home" and that "appropriate services aimed at family preservation and family reunification efforts have been unsuccessful." In a separate order, the court granted the GAL's motion to vacate the order of protection and found that S.W. had "violated [the] terms of order of protection, including provisions that K.C. remain in his therapeutic school, and that [S.W.] enroll him in therapy. [S.W.] also violated the court order of 3/10/2023 prohibiting her from removing the minor from the court's jurisdiction." Last, the court entered an order for a child protection warrant and supplemental order to bring K.C. back to the Department. S.W. was ordered to contact the Department in order to facilitate relinquishment of K.C., as well as to appear at the next court date of March 20 either in person or by electronic means. The order further provided that failure to deliver K.C. to Department custody would subject S.W. to a contempt proceeding.

¶ 49        4. S.W.'s Combined Motion for No Reasonable Efforts and Motion to Compel

¶ 50    On March 16, 2023, following the immediate hearing, S.W. filed a "combined motion for no reasonable efforts and motion to compel [the Department] to provide family preservation services."[12] Therein, S.W. argued that she had been having trouble obtaining psychiatric and

---

[11]During the court's ruling, S.W.'s counsel indicated that a "motion for no reasonable efforts and a motion to compel services" would be filed.

[12]However, during court proceedings on March 16, it appears that this motion was sent to the other parties of record prior to the hearing.

school transportation services for K.C. due to financial hardship after she was terminated from her employment. As such, S.W. requested that the court order the Department to provide family preservation services as required under the Act and other applicable Illinois law. Additionally, S.W. sought a finding that, if the court determined that the Department should provide such services, the court should make an additional finding that the Department had not made "reasonable efforts" to assist with K.C.'s psychiatric and housing needs since he was returned home in January.

¶ 51    On March 20, the GAL filed a response to S.W.'s motion. The GAL argued that, upon information and belief, the Department and its agency had provided several options for K.C.'s therapy and had continually followed up with S.W. concerning those options. However, the GAL acknowledged that a therapist for K.C. had only been made available in February 2023 after he came off the waiting list. The GAL also contested that it was the Department's responsibility to provide transportation to K.C. given the express language of the order of protection. The GAL also acknowledged that S.W. had informed the agency of her financial need, but noted that S.W. had otherwise declined to provide any further details, including her eviction. Nevertheless, the GAL pointed out that the Department had arranged to pay some of S.W.'s past due rent in October 2022, and had attempted to assist S.W. by sending a caseworker to S.W.'s residence in order to deliver the required forms and further arrange to pick up the forms the following week. However, the application was never completed.

¶ 52    With regard to the motion for no reasonable efforts, the GAL argued that S.W. failed to provide evidence that the Department did not meet its obligation to serve the family. The GAL further noted that, prior to the filing of its motion, an emergency meeting had also taken place

between the Department's legal counsel, the GAL, and S.W.'s attorney to address S.W.'s needs in order to maintain custody of the minors.[13]

¶ 53        5. March 20 Hearing and the State's Petition for Rule to Show Cause

¶ 54    On March 20, a hearing was held with S.W. present remotely and through counsel. The GAL reported that K.C. had not yet been returned to Illinois as S.W. reported having car trouble. The court indicated that it would take "further steps to enter a contempt citation." The State responded that it would file a petition for rule to show cause, and the matter was entered and continued.[14]

¶ 55    On March 27, S.W. filed a response to the State's petition for rule to show cause. Therein, S.W. argued, among others, that contempt proceedings were improper because any violation of the order of protection had been due to financial reasons, which was a defense to contempt.[15] S.W. supplemented her filing with additional exhibits on April 3, 2023, which showed various texts and email exchanges between Nalls-Walker and S.W.

¶ 56                            6. March 27 Hearing

¶ 57    On March 27, a hearing was held on the petition for rule to show cause. S.W. was present remotely and through counsel, and K.C. had not yet been returned to the state. In addressing the merits of the petition, S.W.'s counsel argued that S.W.'s actions had been triggered by housing struggles and the threat of homelessness, and further stated that his arguments "should be

---

[13]On April 18, 2023, the GAL further responded to the motion addressing the compulsion of agency records.

[14]This petition does not appear in the record. It is not clear if one was ever filed or if the State simply made an oral motion.

[15]S.W. also filed a "motion to appoint a conflict free attorney for [K.C.]," in which she argued that K.C.'s court-appointed GAL had a conflict between advocating for K.C.'s express wishes versus what was in his best interest. The GAL responded to this motion in writing on March 31, 2023. This motion was denied on April 3, 2023.

considered along with [the] motion for reasonable efforts," as he believed that the motion "play[ed] directly into the issues we're discussing[.]" The court responded that it would only be considering the petition for rule to show cause. The court subsequently issued a rule for indirect civil contempt, and continued the matter for a contempt hearing and "all motions filed to date[.]"[16]

¶ 58                                    7. April 3 Hearing

¶ 59    On April 3, 2023, a contempt hearing was held. Prior to proceeding, S.W.'s counsel indicated that he still had various motions pending before the court, with "the oldest motion" being "the motion for no reasonable efforts, motion to compel in regards to preservation services[.]" S.W.'s counsel clarified that the motion was intended to address the agency's failure to assist S.W. with housing and provide individual and family therapy for K.C. The court pointed out that one of the "major bases" for granting the GAL's emergency motion and vacating the order of protection had been S.W.'s failure to keep K.C. in attendance at school and therapy. The court further stated that it was "not looking to have a long drawn-out argument on what the Department did and didn't do," and if the issue was not presented to the court on March 16, then it was "an issue for another hearing."

¶ 60    The court briefly took testimony from Nalls-Walker, as well as two witnesses for S.W., Jennifer Bauer, a family friend, and S.W.'s mother, Carol Dolan. When questioned by the State, Dolan indicated that she lived in New Baltimore, Michigan, and had last seen K.C. and S.W. in January 2023. She denied that both had stayed at her home in March 2023. When questioned by the GAL as to whether Dolan was aware that S.W. had claimed to be at Dolan's home in Michigan,

---

[16]Following the court's oral ruling, S.W.'s counsel stated: "As your honor is aware, when your Honor vacates an order of protection[,] that was of course a final order. I do intend to file a motion to reconsider." He further indicated that he needed "documentary evidence" such as the agency file as requested in his "motion for no reasonable efforts."

Dolan responded "she can come in whenever" and "she could have been here," but that the two had not discussed it. Following continued questioning, the court then orally entered an order for indirect civil contempt against S.W.[17]

¶ 61                                    8. S.W.'s Motion to Reconsider

¶ 62    On April 10, S.W. filed a motion to reconsider. Therein, S.W. argued that the trial court had erred by: (1) vacating the order of protection as to K.C. based on violations attributable to "poverty"; (2) not continuing the matter to allow her to properly investigate the allegations made by the GAL; (3) questioning counsel on matters concerning attorney-client privilege during the emergency motion hearing; (4) improperly placing weight on C.W.'s interest to leave S.W. while failing to consider K.C.'s express wishes to remain with her; and (5) failing to appoint a new attorney for K.C. S.W. further argued that the court had violated S.W.'s equal protection and due process rights and sought additional agency records. Finally, the motion sought to reverse the court's March 16 order to vacate the order of protection.

¶ 63    On May 19, the GAL filed a response to S.W.'s motion to reconsider. The GAL argued that S.W. did not allege any change in law or any newly discovered evidence to reconsider the court's previous vacatur of the order of protection. The GAL further maintained that the evidence presented in its emergency motions had sufficiently showed violations of the order of protection, as well as the court's express March 10 order prohibiting S.W. from removing K.C. from Illinois.

¶ 64                                    9. April 18 Hearing

¶ 65    On April 18, a status hearing was held. The State reported that Michigan police had executed the child protection warrant. K.C. had been recovered by child protective services and

---

[17]A notice of appeal as to this order was filed on April 13, 2023, and was assigned to our court as case number 1-23-0668. A Rule 23 order disposing of the appeal was issued on December 29, 2023.

the Department was arranging to transfer him back to Illinois. S.W. was also being held in a jail in Michigan. Upon confirmation that K.C. had been recovered by the Department and returned to Illinois, the court quashed the interstate child protection warrant. S.W.'s counsel further indicated that he intended to file an "amended" motion to reconsider. He also stated that his other "motion to reconsider and motion for no reasonable efforts" were pending.

¶ 66        10. S.W.'s Amended Motion to Reconsider

¶ 67   On June 2, immediately prior to a scheduled permanency hearing, S.W. filed an amended motion to reconsider. Therein, S.W. maintained that the court erred in vacating the order of protection because the Department had not met its burden in providing "reasonable efforts" to S.W. as required under the Act and other relevant Illinois law, which otherwise barred the Department from removing minors from homes based on poverty and financial need. S.W. further argued that the court had placed an unreasonable condition on her not to leave the state, despite evidence of imminent homelessness. The motion's other bases for reconsideration included the court's purported errors in: (1) "unreasonably" enforcing the condition requiring K.C. to attend his current school in-person; (2) failing to continue the case and not allowing her to "investigate and obtain sufficient records"; (3) not allowing S.W. to conduct any discovery into the Department's investigation concerning the foster parent; and (4) failing to appoint a new attorney for K.C.[18] The motion further requested reversal of the disposition order that vacated the order of protection.

¶ 68          11. April 24 Hearing

---

[18]S.W. also filed a motion for extension of time to review documents tendered to her by the Department to support her amended motion to reconsider. Although S.W. was granted leave to file the amended motion to reconsider, the court subsequently denied the motion for extension of time on June 2, 2023.

¶ 69    On April 24, 2023, a status was held. Nalls-Walker testified that K.C. had been placed in a non-relative foster home on April 20, but had further indicated that he preferred to live with his maternal grandfather. The court continued the matter to June 2, where it stated it would consider S.W.'s pending motion to reconsider and motion for no reasonable efforts. The court further noted that it would also hold a permanency hearing as to all three children on that date.

¶ 70                          D. Permanency Hearing – June 2, 2023

¶ 71    On June 2, 2023, the court conducted a permanency hearing. S.W. was solely present through counsel. The court first addressed and denied S.W.'s motion to reconsider. In so doing, the court noted that it did not:

> "THE COURT: *** see any new information in your motion and I don't see any new law. You just disagree with the court's opinion and ruling ultimately in terms of vacating the order of protection. So unless you can provide to me some new facts that could not have been discovered at the time of the hearing and the vacation of the order of protection or some new law that exists or [new] law that I've violated, then I'm going to have to deny your motion[.]"

¶ 72    Subsequently, the court proceeded to conduct the permanency hearing, and expressly noted that it would also consider "any evidence or testimony in support of [the] motion for no reasonable efforts[.]"

¶ 73    Nalls-Walker was sworn in as a witness and she testified as follows. At his request, K.C. had been placed with his maternal grandfather following a week-long placement with a nonrelative foster parent. On May 20, Nalls-Walker visited him and reported no safety concerns or signs of abuse, neglect, or corporal punishment. K.C. was currently enrolled in his previous therapeutic school and communicated with Nalls-Walker over email weekly. K.C. appeared "a bit

dysregulated," and that some days "are good" and "some days are different." K.C.'s school psychologist believed he became the most dysregulated when communicating with S.W. K.C. received therapeutic services at school and had a therapy appointment scheduled for June 10. Overall, Nalls-Walker felt that K.C. was "confused and all over the place" and "really [didn't know] what he wants at the time." The agency had conducted a meeting to see if he required any further specialized services, but no determination had been made as they wanted to continue to assess him in his current placement. The agency had not yet staffed a goal for K.C., but the likely recommendation would be guardianship. K.C. had indicated that he wanted to be with his mother, but was not sure that it was a "good place" for him. He also did not want to be placed with his nonrelative foster parent due the strictness of the household.

¶ 74     Nalls-Walker had attempted to schedule in-person visits or Zoom calls between S.W. and K.C., but S.W. was resistant to supervised visits. S.W. had communicated to her that she was homeless and was often hostile to Nalls-Walker over various methods of communication. K.C. also appeared indifferent to visiting his mother in person and thus no visits were currently scheduled. The agency had also reassessed S.W.'s needs for services in March 2023 and recommended additional family therapy and psychiatric assessments, of which Nalls-Walker had provided referrals for. She had not made an individual therapy referral, but had recommended the service to S.W.

¶ 75     Upon examination by the State, Nalls-Walker testified as follows. When asked if she was aware that police had responded to a well-being check for S.W. in Michigan on the basis of suicidal ideation, Nalls-Walker responded that she had been unaware of that information. She admitted to receiving a phone call from someone in Michigan concerning that, but had not been provided with

much information. Nalls-Walker did not know where S.W. was located, but S.W. had texted her before today's proceedings "with some kind of threat."

¶ 76    Upon examination by S.W.'s counsel, Nalls-Walker admitted that much of her interactions with S.W. had been hostile and that S.W. blamed her personally for the case's current status. She did not know if S.W. was homeless, but knew at one point S.W. had told her she was with one of the minor siblings' fathers. She was aware that S.W. was in need of financial assistance based on her interaction with S.W. in March. She was unaware if S.W. had been employed consistently but knew of one instance of prior employment. Nalls-Walker reiterated that she attempted to help S.W. fill out the Norman funds application in March, and documented such efforts in a contact note. The form was initially sent electronically, but S.W. had indicated that she did not have the technology to fill out the form, and Nalls-Walker brought the form to her personally on March 7. This had been the second Norman funds application, with the first paying off her rent arrears in September or October of last year, and the second one to be used as a referral for low-income housing. She denied knowledge of any outstanding applications for a Norman voucher. At the time of the first request, S.W. had not voiced any concerns about housing beyond needing to pay rent. Nalls-Walker had been unaware of S.W.'s eviction proceedings until a few days after the children were returned home. It was possible that S.W. had been informing the agency of housing issues since February 2022, but the agency had not been made aware of eviction proceedings until recently.

¶ 77    Nalls-Walker further described S.W.'s current behavior as "erratic," which began around the time K.C. was removed. The agency's recommendation for S.W. to engage in continued services was based on her actions from the end of February until today. When asked if getting

S.W. into housing would alleviate some of these issues, Nalls-Walker responded that it was "possible" but S.W. would not tell the agency of her location and thus it could not assist her.[19]

¶ 78          E. Trial Court Ruling on Motion for Reasonable Efforts and Permanency

¶ 79    Following continued questioning, the court orally denied S.W.'s motion for no reasonable efforts. With regard to K.C., it found the Department had made "reasonable efforts," that K.C.'s current placement was necessary and appropriate to the case plan and goal, and that a return home permanency goal of 12 months was appropriate. It noted that its permanency goal finding was a bit of a "misnomer because [permanency goals] are not permanent and they can be changed," given that the parties had not yet explored the possibilities of adoption or private guardianship. The court further indicated that any appeal of its decision was "discretionary because there's no right to appeal this decision." The court speculated that the previously entered "modified disposition order could be appealed" but "but in terms of the reasonable efforts, I don't know[.]"

¶ 80    Subsequently that day, the court entered numerous written orders. First, the court entered a permanency order for K.C., which indicated a "return home" of 12 months for K.C. and that S.W. had not made substantial progress towards the previous return home goal. The order expressly noted that S.W. had not "cooperated with [the] agency or re-engaged in services since [the] minor was removed from her care in March, 2023." The court further determined that the Department's services were "appropriate and reasonably calculated to facilitate achievement of the permanency goal," which could not immediately be achieved because services were ongoing

---

[19]S.W.'s counsel began to question Nalls-Walker about therapeutic services and the court interjected, asking why such testimony was relevant. Counsel for S.W. stated that there was a pending "motion for no reasonable efforts" and that such testimony would go to whether the agency could provide appropriate services based on its failure to do so in the past. The court admonished counsel on this point and pointed out that S.W. was not present in court to provide testimony for this line of questioning.

and K.C. was still under the age of 21. The court further found K.C.'s placement with his maternal grandfather as "necessary and appropriate to the case plan and goal," and that the Department had made "reasonable efforts in providing services to facilitate achievement of the permanency goal." The court also entered written orders denying S.W.'s motion for no reasonable efforts.

¶ 81    This appeal followed.[20]

¶ 82                                II. ANALYSIS[21]

¶ 83                                A. The Act

¶ 84    S.W. contends that the trial court's denial of her motion for no reasonable efforts was against the manifest weight of the evidence. However, in its response brief, the GAL preliminarily challenges our jurisdiction to review that ruling. To address this, we first provide some context of the Act in relation to this appeal's procedural posture.

¶ 85    The Juvenile Court Act of 1987, 705 ILCS 405/1-1, *et seq.* (West 2020), governs the procedures for removal of a minor from their parents' custody in order to protect the minor's safety, moral, emotional, mental, and physical welfare. *Id.* § 405/1-2 (West 2020); *In re D.B.*, 2023 IL App (1st) 230059, ¶ 56. Removal proceedings may be initiated if a minor under the age of 18 is alleged to be neglected or abused. 705 ILCS 405/2-3(1). Instances of neglect may be found

---

[20]S.W.'s Notice of Appeal states that the matter is subject to expedited disposition under Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311 governs the mandatory accelerated disposition of appeals related to child custody, allocation of parental responsibilities, or relocation of unemancipated minors. However, S.W.'s brief states that our jurisdiction is derived from Rules 301 and 303. We discuss the varying rules later in our disposition.

[21]As noted in the prior footnote, this case is subject to expedited disposition pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which requires our court to issue a disposition within 150 days after the filing of a notice of appeal, except for good cause shown. Here, the notice of appeal was filed on June 30, 2023, making our decision due on or before November 27, 2023. However, this case was not made ready for review until January 2, 2024, following the filing of multiple motions for extension of time filed by the parties in this matter. As such, we find good cause exists for the delay in rendering our decision.

where the minor is "not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being[.]" *Id.* § 405/2-3(1)(a) (West 2020); see also *id.* § 405/2-3(1)(b)-(e) (West 2020).

¶ 86                                    1. The Petition

¶ 87     Child neglect and abuse proceedings are initiated by the filing of a petition for wardship by the local State's Attorney. *Id.* § 405/2-13(1) (West 2020). The trial court then conducts an adjudicatory hearing within 90 days of service of the petition to determine the question of "whether the minor is abused, neglected or dependent." *Id.* § 405/2-18 (West 2020); *Id.* § 405/2-14(b) (West 2020). The court must also appoint a guardian *ad litem* for the minor. *Id.* § 405/2-17(1)(a) (West 2020)).

¶ 88     At the adjudicatory hearing, if the court finds that the State has met its burden of proving its allegations of neglect by a preponderance of the evidence, the court then proceeds to a disposition hearing. *Id.* § 405/2-21(2) (West 2020); see also *D.B.*, 2020 IL App (1st) 230059, ¶ 57. There, the trial court is tasked with determining whether the minor shall be made a ward of the court in accordance with their best interest and the interest of the public. *Id.* § 405/2-22(1) (West 2020). If a minor is adjudged to be a ward of the court, the court also considers "the proper disposition best serving the health, safety and best interests of the minor and the public." *Id.* Finally, the court must consider the minor's "permanency goal" pursuant to section 2-28 of the Act (*id.* § 405/2-28) (West 2020)), as well as the nature of the minor's service plan and the plan's accompanying services. *Id.* § 405/2-22(1). The court must also set a date for the minor's first permanency hearing. *Id.* § 405/2-22(5) (West 2020).

¶ 89                                    2. Disposition Orders

¶ 90 Following the hearing, if the court determines that a ward of the court's parents are unfit or unable to care for the minor, the court must enter a written disposition order. *Id.* § 405/2-23 (West 2020); *Id.* § 405/2-27(1). The court may further order to place the minor in the custody of another suitable relative or other person. *Id.* § 405/2-27(1)-(2) (West 2020). In doing so, the court shall consider whether, "based on the health, safety, and the best interests of the minor" that: (a) "appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor, or (b) no family preservation or family reunification services would be appropriate." *Id.* § 405/2-27(1.5)(a)-(b) (West 2020). Unless expressly noted, a disposition order "does not operate to close proceedings on the pending petition" and is "subject to modification *** until final closing and discharge of the proceedings" under section 2-31 of the Act. *Id.*

¶ 91 The court may also enter "any orders necessary" to fulfill the applicable service plan, which may include "orders requiring parties to cooperate with services," "restraining orders controlling the conduct of any party likely to frustrate the achievement of the goal," and "visiting orders." *Id.* § 405/2-23(3) (West 2020). A disposition order may also provide for protective supervision and can include an order of protection. *Id.* § 405/2-23(2) (West 2020). The order of protection may include any "reasonable" condition for a specified period of time so long as the condition is based on the minor's health, safety and best interests and is otherwise authorized by the Act. *Id.* § 405/2-25(1) (West 2020). The order of protection may be modified or extended for a further period of time, or terminated if the court finds that both the minor and the public's health, safety and best interests will be served. *Id.* § 405/2-25(4) (West 2020)). If a motion is filed alleging violation of such conditions and the court determines that the violation is "of a critical service necessary to the

safety and welfare of the minor," the court may reallocate temporary custody of the minor and may begin contempt proceedings. *Id.* § 405/2-25(9) (West 2020); see also *Id.* § 405/2-26(1) (West 2020) (discussing enforcement of orders of protection).

¶ 92                                   3. Permanency Hearings

¶ 93    The trial court must also conduct a permanency hearing within 12 months of the date that temporary custody was taken, regardless of whether an adjudication or disposition hearing was completed. *Id.* § 405/2-28(2) (West 2020). Subsequent permanency hearings are to be held every 6 months or more frequently if the court deems them necessary, or until the court determines that the plan and goal have been achieved. *Id.* At the permanency hearing, the court shall determine the future status of the child and set a permanency goal, which may include a variety of "return home" goals, such as: the minor's return home within 5 months (*Id.* § 405/2-28(2)(A) (West 2020)); the minor's placement in short-term care with the continued goal to return home within a year, to be evaluated in accordance with the parent's progress and the minor's individual needs and age (*Id.* § 405/2-28(2)(B) (West 2020)); or the minor's placement in short-term care with a continued goal to return home pending a status hearing and the parent's reasonable efforts in satisfying his or her progress goals (*Id.* § 405/2-28(2)(B-1) (West 2020)).

¶ 94    In determining the permanency goal, the court considers the minor's best interest in light of multiple statutorily-defined factors. *Id.* § 405/2-28. If the court finds that a parent has not made reasonable efforts or reasonable progress, the court shall identify what actions the parent and the Department must take in order to justify a finding of reasonable efforts and reasonable progress. *Id.* § 405/2-28(2)(B-1). The court will then set the matter for status between 9 and 11 months after a minor's adjudication, where the parent's progress will again be reviewed. *Id.*

¶ 95                                   4. Termination of Wardship

¶ 96　Wardship proceedings are automatically terminated upon the minor attaining 21 years of age or upon court order. *Id.* § 405/2-31(1)-(2) (West 2020). As to the latter, if the court determines and makes written factual findings that the minor's health, safety, and best interests no longer require wardship of the court, the court shall order the wardship terminated and subsequently close out or discharge any and all proceedings under the Act. *Id.* § 405/2-31(2).

¶ 97　　　　　　　　　　　　　　　B. Jurisdiction

¶ 98　The dispositive issue on appeal concerns our jurisdiction. S.W.'s notice of appeal identified the court's June 2 judgment as the appealable order, which she characterized as "findings after disposition hearing."[22] S.W.'s jurisdictional statement further identifies Supreme Court Rules 301 and 303 as the bases for jurisdiction, and further states that:

> "[t]he notice of appeal refers to 'findings after disposition hearing' with a judgment date of June 2, 2023, and that day, the disposition hearing concluded with a denial of the amended motion to reconsider. In *In re William H.*, 407 Ill. App 3d 858, 865-66 (1st Dist. 2011), the [c]ourt reviewed a similar order entered at the end of the dispositional hearing. See also *In re Jennifer W.*, 2014 IL App (1st) 140984 ***[.].

> The notice of appeal was timely filed on June 30, 2023, within 30 days of [June 2], 2023,[23] when the order appealed from was entered. See Supreme Court Rule 303(a)."

¶ 99　The GAL's argument for lack of jurisdiction is multi-faceted.[24] First, the GAL contends that there is no requisite jurisdiction under Rules 301 or 303, as the order denying the motion for

---

[22]The Notice of Appeal did not attach a copy of the subject order. As discussed above, the trial court entered multiple orders concerning K.C. on June 2.

[23]The appellant's jurisdictional statement initially reflected March 23, 2023, as the date of the order being appealed. She later clarified that the correct date of the order appealed from was June 2, 2023.

[24]The State also filed a brief and adopted the entirety of the GAL's jurisdictional arguments therein.

no reasonable efforts is solely interlocutory in nature, versus that of a disposition order, which is usually reviewable under the same rules, citing *In re Jennifer W.*, and *In re Joseph J.*, 2020 IL App (1st) 190305, in support. According to the GAL, a "reasonable efforts" determination is time-specific and only addresses the adequacy of the Department's efforts at the time of ruling, which is usually assessed in accordance with whether family reunification can be achieved with the Department's help.

¶ 100   The GAL acknowledges that we may still have jurisdiction if the "no reasonable efforts" ruling constituted a "necessary step in the procedural progression leading to the disposition order." However, the GAL points out, the ruling at issue coincided with a permanency order which included a "return home" goal pursuant to section 2-28 of the Act, which are generally considered to be temporary in nature and therefore non-final for purposes of appeal, citing *In re Curtis B*, 203 Ill. 2d 53 (2002), and *In re Faith B*, 216 Ill. 2d 1 (2005). Thus, the GAL reasons, because the court's permanency ruling still contemplated continuing efforts to reunite K.C. with his mother, it cannot be considered a final or necessary step in the progression leading to final adjudication of wardship. With regard to S.W.'s reliance on *In re William H*. as contained within her jurisdictional statement, although the GAL concedes that the court there also assessed a "reasonable efforts" ruling, the GAL points out that the case did not contain any discussion as to jurisdiction and therefore should not be considered dispositive.

¶ 101   Finally, the GAL concludes, S.W. cannot find solace in any other supreme court rules that could confer jurisdiction. Specifically, the GAL argues that the "no reasonable efforts" ruling is not appealable under Supreme Court Rule 304, as it did not "finally" determine the right or status of a party. Additionally, the GAL continues, although Supreme Court Rule 306(a)(5) allows for discretionary review of a permanency order, S.W. would have needed to file a petition for review

within 14 days of the entry of the challenged order, which did not happen here, citing *In re Joseph J.* in support.

¶ 102   In reply, S.W. contends that the "no reasonable efforts" ruling should be construed as contributing to the final disposition ruling, which, according to her, was the denial of the motion to reconsider. S.W. concedes that her motion to reconsider was ruled upon prior to the start of the permanency hearing, but maintains that the timing of the ruling was "arbitrary" and ultimately had the "practical effect of seeking reconsideration of the finding in the final disposition order that reasonable efforts had been made" and thus was a "step in the procedural progression." S.W. also rejects characterizing the "no reasonable efforts" ruling as related to the court's permanency order because, although the latter could be modified, a "no reasonable efforts ruling" is a "characterization of past action" and thus not subject to modification.

¶ 103          1. Is the Reasonable Efforts Ruling a Final and Appealable Order?

¶ 104   We first turn to Supreme Court Rules 301 and 303, which, according to S.W., are the bases for our jurisdiction. Rule 301 governs the appeals of "final judgments" in civil cases which are appealable as of right. Ill. S. Ct. R. 301 (eff. Feb 1, 1994). Supreme Court Rule 303 works in tandem with Rule 301 by setting forth the requirements of such an appeal. Ill. S. Ct. R. 303(a)(1), (2) (eff. July 1, 2017). Also relevant here is Supreme Court Rule 311, which governs the accelerated disposition of appeals from final orders relating to child custody, allocation of parental responsibilities, and relocation of unemancipated minors. Ill. S. Ct. R. 311(a) (eff. (July 1, 2018).[25]

---

[25]We also observe that Supreme Court Rule 311 does allow for review of "interlocutory appeals in child custody or allocation of parental responsibilities cases or decisions allowing or denying relocation *** **** *** from which *leave to appeal has been granted* pursuant to Rule 306(a)(5)." (Emphasis added.) Ill. S. Ct. R. 311. The rule also appears to consider appeals "taken from a judgment or order affecting other matters, such as support, property issues or decisions affecting the rights of persons other than the child, unless doing so will delay decision on the child custody or allocation of parental responsibilities or

¶ 105 In determining whether an order is final and appealable, we consider whether the order "terminates the litigation between the parties on the merits or disposes of the rights of the parties either on the entire controversy or on a separate part thereof." *In re Alexis H*, 335 Ill. App. 3d 1009, 1012 (2002). A "final judgment" is one that "fixes absolutely the rights of the parties," where, if affirmed, "the only thing remaining is to proceed with the execution of the judgment." *Id.*

¶ 106 As shown above through our summary of the Act and the recitation of this case's procedural history, multiple types of orders may be entered throughout a wardship proceeding, and generally only some are reviewable. For instance, a disposition order is generally considered final for purposes of appeal. See *In re Brandon S.*, 331 Ill. App. 3d 757, 760 (2002); *In re D.S.*, 307 Ill. App. 3d 362, 365 (1999). In contrast, a permanency order is generally not considered a final order as it is subject to review and re-evaluation at a minimum of every six months. See 705 ILCS 405/2-28(2); see also *In re Curtis B*, 203 Ill. 2d 53, 58, 59-60 (2002) (a permanency order generally does not contain any determinations that are "set or fixed as a matter of law."); *Alexis H.*, 335 Ill. App. 3d at 1012 (following each permanency hearing, a trial court's permanency order vacates the original disposition and supersedes it, thus leaving "[a]ll of the rights and obligations set forth in permanency order *** open for examination and possible revision until the permanency goal is achieved.") (quoting *Curtis B.*, 203 Ill. 2d at 60)); *In re Joseph J*, 2020 IL App (1st) 190305, ¶ 24 (noting that a permanency order is interlocutory and non-final).

¶ 107 However, as noted by our supreme court in *In re Faith B*, 216 Ill. 2d 1, 16 (2005), a relevant consideration as to an order's finality is the "nature of the order." For instance, a permanency order may be considered a final judgment and thus reviewable under Rule 301 if the order appears to be

---

relocation of the unemancipated minors' appeal." Ill. S. Ct. R. 311. The interlocutory component of Rule 306(a)(5) is discussed later in our disposition.

"final and immutable" at the time it was made, meaning that if a permanency "goal has been reached," the order may constitute a final judgment. *Id.* at 17-18. Additionally, a disposition order may not be final for purposes of appeal if the disposition ruling does not "permanently determine the rights of the parties nor expressly resolve any issue in the case," such as "the return home of" the minor children. *Brandon S.*, 331 Ill. App. 3d at 761. As such, we must assess the circumstances by which the court's multiple June 2 orders arose to determine the effect of the court's ruling as to the reasonable efforts motion.

¶ 108    The record demonstrates that three substantive orders were entered on June 2: one denied S.W.'s "no reasonable efforts" motion; another denied S.W.'s amended motion to reconsider, and the third was a permanency order entered after a hearing. S.W.'s "no reasonable efforts" motion was filed on March 16, following a hearing on the GAL's emergency motions and the court's March 10 modified disposition order which adjudicated K.C. as a ward of the court. The motion specifically sought a finding that the Department had not made reasonable efforts since the minors had been placed back in S.W.'s care. The motion was left unaddressed by the court until June 2, when both minors were no longer living with S.W.

¶ 109    S.W.'s first motion to reconsider was filed on April 3 and sought reversal of the "[c]ourt's March 16 order vacating the minor's order of protection." Notably, it did not expressly challenge the entire March 16 disposition order. In her amended motion, S.W. challenged the court's: (1) vacating of the order of protection; (2) the court's refusal to continue the emergency motion to allow counsel to raise the issue of "no reasonable efforts"; and (3) other procedural issues during the court's hearing. The later filed motion discussed the issue of "reasonable efforts" therein, and ultimately sought reconsideration of the court's "dispositional order vacating the order of protection and return[ing] the minor home." This motion was also left unaddressed until June 2.

¶ 110　On June 2, prior to conducting the permanency hearing, the court denied S.W.'s motion to reconsider after it determined that S.W. did not allege any new evidence or changes in the law as to its vacatur of the order of protection. The court then expressly stated that it would consider the motion for no reasonable efforts within the context of permanency hearing, which ultimately included Nalls-Walker's testimony as to her efforts to coordinate services with S.W. both while K.C. and C.W. were in her care, as well as after the children were removed.

¶ 111　In our view, when both motions were originally filed, they attempted to seek reconsideration of the court's March 10 order, which vacated the order of protection, in addition to its March 16 disposition order. Specifically, both challenged the court's vacating of the order of protection based on S.W.'s violations, which according to S.W., were in part due to the Department's failure to assist her with her express duties outlined therein. However, both motions appeared to languish for months in court, and although S.W.'s counsel mentioned their pending nature over the course of numerous court hearings, he did not seek any express entry or denial. Further, after the court denied the motion to reconsider on June 2, counsel did not object when the court indicated that it would assess the motion for no reasonable efforts with the evidence presented during the permanency hearing. Thus, the hearing included testimony regarding the minor children's current placement status as well as the events leading up to their removal from S.W.'s home months prior. As such, S.W.'s motion for no reasonable efforts appeared to merge directly into the permanency proceedings.

¶ 112　However, merely because the two were considered and ruled on together does not make their final determinations appealable. As noted prior, a permanency order is *generally* not considered to be final. Based on our assessment of the record, we ultimately agree with the GAL

that the June 2 permanency order was not intended to be final as demonstrated by the court's oral pronouncement and the express language of the written order.

¶ 113   In its oral ruling, the court commented that permanency goals are a "misnomer because they are not permanent and can be changed." The court also noted that the parties had not explored the possibility of private guardianship or adoption, and that such goals could be discussed moving forward. The court also indicated that, if S.W. were to cooperate and engage in services, she could still work towards a return home goal for K.C. Finally, the court observed that any appeal of its permanency order would be discretionary, therefore indicating it did not view the order as final. Compare *In re Faith B*, 216 Ill. 2d at 17 (finding an "atypical" permanency order to be final in nature based on its entry with a separate dispositional order, the trial court's express pronouncement that the order was final and appealable, the trial court's refusal to hold a future permanency hearing, and the trial court's comment that it believed the only acceptable care plan was guardianship by another relative and thus left no room for future modification).

¶ 114   The written permanency order also bolsters this conclusion. The order does not make a final determination as to the termination of parental rights; rather, it delineates a prior reunification goal to return K.C. home within 12 months. The order further indicated that "services are ongoing" due to S.W.'s lack of cooperation with the agency and participation in recommended services, as well as the fact that K.C. was not 21 years old, which would have automatically terminated such proceedings. See 705 ILCS 405/2-31(1)-(2). Finally, the case was also scheduled for another permanency hearing in November 2023.

¶ 115   We also do not find that S.W.'s reliance on *In re William H*., 407 Ill. App. 3d 858 (2011), compels a different result. There, following an adjudication hearing where the minor child was found neglected and abused, the disposition hearing was delayed due to the parties' failure to

complete required assessments. *Id.* at 861-62. Prior to the scheduled hearing, the respondent mother filed a motion requesting a finding that no reasonable efforts had been made to reunify her and the minor. *Id.* At the next court appearance, the court conducted a disposition hearing and heard argument on the respondent's motion. *Id.* at 862-63. During the hearing, an agency caseworker testified that the respondent had not participated in any required agency services and that the minor's current placement was safe and appropriate. *Id.* The court also heard testimony that the child was in therapy, but that the minor did not wish to have contact with the respondent and rejected efforts for the agency to coordinate such visits. *Id.* at 863-64. Following the hearing, the State and GAL agreed that it was in the child's best interest to be made a ward of the court, that the respondent be found unable to care for him, and that her motion for reasonable efforts be denied. *Id.* at 864. However, the respondent argued that she should solely be found "unable" and that the court should grant her motion for no reasonable efforts. *Id.*

¶ 116   The court ultimately adjudged the minor to be a ward of the court, and entered an additional finding that the respondent was "unable" to care for him. *Id.* at 865. With regard to the motion for no reasonable efforts, the court assessed the evidence presented during the hearing, which included the case's delayed timeline and the respondent's refusal to participate in required services. *Id.* at 864-65. The court denied the motion and found that the Department had made "reasonable efforts" to reunify the family based on the child's participation in therapy, as well as the Department's attempts to facilitate visits between the child and the respondent, even if such visits had not come to fruition. *Id.* at 864-65.

¶ 117   On appeal, the respondent argued that the trial court erred in denying her motion. Although no jurisdictional argument was raised by any of the parties or discussed by the court *sua sponte*, the appellate court construed the reasonable efforts ruling as subsumed within the entire disposition

hearing and subsequent order. Specifically, the court noted that the trial court's "reasonable efforts finding was entered at the end of the dispositional hearing" and thus "became a part of the court's dispositional ruling" where the minor was adjudged a ward of the court. *Id.* at 866; see also *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 48 (where a court's findings of reasonable efforts occurred in the course of its disposition ruling, it is reviewed in the same way as any other decision made during that ruling). The appellate court then proceeded to assess the totality of the disposition ruling, which was ultimately affirmed in its entirety. *Id.* at 866, 873.

¶ 118   Preliminarily, in our case, we point out that any arguments regarding "reasonable efforts" contained within S.W.'s motion to reconsider were denied by the court prior to the start of the permanency hearing, which it stated would be conducted with the reasonable efforts motion in mind. Thus, we do not find S.W.'s argument as to the timing of the motion to be persuasive as it is clear that the motion to reconsider was sufficiently separate from the permanency proceedings.

¶ 119   However, we still find *William H.* inapplicable. We acknowledge that here, as in *William H.*, the court's reasonable efforts finding was subsumed within the hearing and its assessment of the evidence therein. However, what is distinguishable is the type of proceeding that occurred. In *William H.*, the proceeding at issue was a disposition hearing, and as noted above, a disposition order is generally considered final and appealable. See also *Joseph J.*, 2020 IL App (1st) 190305, ¶ 25 (an otherwise interlocutory permanency order considered final when entered in accordance with a dispositional order). In contrast here, the trial court's ruling occurred during a permanency hearing, which generally is not considered to be a final phase in such proceedings, and, as discussed above, was not intended to be, given that the matter was scheduled for another permanency hearing as the goal of return home had not yet been achieved. See *Id.* ¶ 25. Thus, even when considering both orders together, we still do not find the court's permanency ruling to

constitute a final order for purposes of appeal. Accordingly, we do not find that we have requisite jurisdiction to review the trial court's June 2 ruling under either Rules 301 or 303.

¶ 120                    2. Alternative Jurisdiction under Rules 306(a)(5) and 304(a)

¶ 121    The GAL further argues that, although our supreme court rules may allow for our court to exercise jurisdiction over permissive appeals of non-final orders, S.W. also cannot find solace there. We note that S.W.'s reply brief does not address the GAL's argument that there is no jurisdiction over her appeal even under Rules 306(a)(5) or 304(a). As such, we would ordinarily consider any additional argument to be forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited). However, for purposes of completeness, we would still be unable to find that we have jurisdiction to review the merits of the case.

¶ 122    Rule 311 provides that certain interlocutory appeals in child custody matters are reviewable if "leave to appeal has been granted pursuant to Rule 306(a)(5)." Ill. S. Ct. R. 311(a). In turn, Rule 306(a)(5) provides that a party may petition for leave to appeal to our court from "interlocutory orders affecting the care and custody of the allocation of parental responsibilities for unemancipated minors or the relocation (formerly known as removal) of unemancipated minors" if such an appeal "is not otherwise specifically provided for elsewhere in these rules." Ill. S. Ct. R. 306(a)(5). Because our supreme court has found permanency orders to be generally interlocutory in nature, the June 2 permanency order here arguably may have fallen within the ambit of Rule 306(a)(5). See *Curtis B*, 203 Ill. 2d at 61.

¶ 123    However, Rule 306 governs *permissive* appeals and thus contains further requirements for such an appeal that were not met here. One such requirement is that the petition for leave to appeal must be filed within 14 days of the entry of the order of which the appeal is being sought. See Ill. S. Ct. R. 306(b)(1) (eff. Oct. 1, 2020). Our review of the record does not show that S.W. filed such

a petition, and even if she had, she also did not file her notice of appeal within 14 days of the June 2 order. See *Joseph J.*, 2020 IL App (1st) 190305, ¶ 24 (declining to exercise jurisdiction where appellant did not file the requisite petition and filed the notice of appeal after 14 days); *In re Alicia Z*, 336 Ill. App. 3d 476, 493-94 (2002) (refusing to exercise discretionary jurisdiction under Rule 306(a)(5) where there was no showing of required application for permissive appeal and judicial economy would not otherwise be served). As such, Rule 306(a)(5) cannot serve as a mechanism for our review.

¶ 124    Additionally, S.W.'s appeal is not proper under Rule 304(a), which allows for appellate review of a final judgment, even if all claims for relief in the pending matter have not yet been resolved. Ill. S. Ct. R. 304(a) (eff. March 8, 2016). Specifically, the rule provides that:

> "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more, but fewer than all of the parties or claims only if the trial court has made an express finding that there is no just reason for delaying either enforcement or appeal or both. Such a finding may be made at the time of entry of the judgment or thereafter on the court's own motion or motion of any party." Ill. S. Ct. R. 304(a).

¶ 125    As discussed prior, there was no final judgment entered in the instant proceedings. Further, the trial court did not indicate in either its oral ruling or written order that any of its findings were immediately appealable within the meaning of Rule 304(a), and even stated on the record that it did not believe the permanency order was appealable. Thus, we also do not have jurisdiction under Rule 304(a).

¶ 126    In sum, we cannot find that we have jurisdiction to review the trial court's order under any articulated basis for review. As such, we decline to address the substantive merits of S.W.'s appeal, and ultimately dismiss it for lack of jurisdiction.

¶ 127                              III. CONCLUSION

¶ 128    For the reasons stated, the appeal is dismissed for lack of jurisdiction.

¶ 129    Appeal dismissed.

---

### *In the Interest of K.C.*, 2024 IL App (1st) 231166

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020-JA-663; the Hon. Maxwell Griffin, Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Suzanne A. Isaacson, of the Cook County Public Defender, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Charles P. Golbert, Kass A. Plain, and Mary Brigid Hayes, of the Office of the Cook County Public Guardian, of Chicago, for appellee. |
| | Enrique Abraham and Gina DiVito, of the Cook County State's Attorney, of Chicago, for appellee. |